**POLICE OFFICERS FOR EQUAL RIGHTS, et al., Plaintiffs,**

v.

**CITY OF COLUMBUS, et al., Defendants.**

No. C–2–78–394.

United States District Court, S.D. Ohio, E.D.

Jan. 8, 1985.

Alexander M. Spater, Columbus, Ohio, for plaintiffs.

Donald Keller, Asst. City Atty., Columbus, Ohio, for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

### I. *Introduction*

For a number of years this Court has participated in litigation concerning the City of Columbus Division of Police. In *Marbaugh v. Sensenbrenner,* Case No. C–2–71–391 (S.D.Ohio 1975), *Haynie v. Chupka,* Case No. C–2–73–401 (S.D.Ohio 1975), *Brant v. City of Columbus,* Case No. C–2–75–425 (S.D.Ohio 1977), and now in the present lawsuit, I am again required to confront extremely difficult issues important to the Division and our community.

After having spent hundreds of hours hearing and evaluating testimony in these cases, I believe I have some means of knowing the many strengths and some of the deficiencies of the Division. In most areas the Division has provided excellent service to this community. This long history of excellence has resulted from the combined efforts of women and men who performed this often dangerous and difficult work for less than desirable compensation. Nothing in this opinion should be read to denigrate the positive contribution of such individuals.

However, this case concerns a number of problem areas in the Division having to do with race. It is also noted that consideration of certain historical facts concerning race relations in the Division is mandated and appears hereinafter. The Court is well aware that times have changed, highly significant new procedures are in place in the Division, and that any unnecessary recitation of the unfortunate past may be perceived as unfair. It is not my purpose to deprecate new efforts to achieve racial fairness by blaming today's officials for past acts of yesterday's officials. Nevertheless, history is important for the limited purpose explained in this opinion.

The trial of this case was long. Therefore, this opinion is long even though the Court has not found it necessary to comment on each and every factual and legal dispute generated by the advocates. Included in the discussion which follows is an analysis of extensive statistical evidence. Although the Court has empathy for persons who may read this opinion who are not trained in or familiar with modern statistics, there is no avoiding an appraisal of the parties' statistical evidence. In addition, the Court must refer to administrative agency guidelines and Title VI and Title VII case law, and in doing so speak in a language which to many, may be quite arcane.

With the above considerations in mind, the reasons for the Court's decision are set forth hereinafter.

### II. *Procedural History of the Case*

Plaintiffs allege discriminatory treatment on the basis of race in their employment with the Columbus Division of Police. This Court has jurisdiction of the issues raised herein pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e–5. The parties at the trial in this case are as follows and will be identified as such in this opinion:

*Plaintiffs.* This matter has been certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The class consists of those black officers, past and present, employed by the Columbus Division of Police during the pendency of this action. Plaintiff Police Officers for Equal Rights, Inc. (POER) is an Ohio not-for-profit corporation whose members include certain past and present black officers of the Columbus Division of Police. One of the organization's avowed goals is to promote equal opportunity for all officers in the Division of Police.

Individually named plaintiffs include black male and female officers who allege to personally have been, and to represent other black officers who have been, the victims of discrimination. These individually named officers include Andrea Barrett, Ronald Bosley, David Crawford, George Garrett, Charles Martin, Jodie Reeder, David Vines, Judy Stubblefield, Ollie Stubblefield, and Clyde Haynie. Many of the named plaintiffs have filed charges with the Equal Employment Opportunity Commission (EEOC). *See, e.g.,* Pl. Ex. 427, 429–436. Many of these plaintiffs have

received notices of a right to sue from the EEOC. *See e.g.*, Pl. Ex. 511, 513–519.

*Defendants.* The defendants in this lawsuit are the City of Columbus, former Mayor Tom Moody, succeeded by Dana Rinehart on January 1, 1984; former Police Chief Earl Burden, succeeded by Dwight Joseph, Jr. in April 1983; Public Safety Director Bernard Chupka, succeeded by Alphonso Montgomery in 1984; members of the Civil Service Commission, Thelma Schoonover, John Young and Walter Tarpley who succeeded Earl Sherard, and the Commission's executive secretary, Earl Murry.

The City of Columbus is an employer subject to the terms of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.* More specifically, Title VII was extended to public employers, 42 U.S.C. § 2000e–17, effective March 1972.

The defendant City of Columbus has been sued in this Court on two other occasions for certain violations of Equal Employment Opportunity laws. In 1975, this Court ordered the City to strive to meet minority hiring goals to rectify Division hiring practices which were found to be racially discriminatory. *Haynie v. Chupka*, Case No. C–2–73–401 (S.D.Ohio 1975). In 1977, this Court concluded that the Division of Police had engaged in illegal gender-based discrimination in hiring. *Brant v. City of Columbus*, Case No. C–2–75–425 (S.D.Ohio 1977).

The instant suit was filed on April 26, 1976, by Officer Jodie Reeder and others. Thereafter, POER and additional black police officers were added as parties plaintiff. On November 29, 1979, this action was certified as a class action. This action was originally brought pursuant to Title VI and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* Title 42 U.S.C. §§ 1981 and 1983 and the Thirteenth and Fourteenth Amendments to the United States Constitution.

On February 28, 1984, following notice to class members and an opportunity for those class members to be heard, plaintiffs'

motion to dismiss claims brought pursuant to 42 U.S.C. §§ 1981 and 1983 and the Constitution was granted. At that time plaintiffs' motion to file a third amended complaint was also granted.

This matter proceeded to trial on March 12, 1984, on the issue of liability only. The trial concluded on April 20, 1984. The record is extensive. Over 100 witnesses were heard and over 600 exhibits were admitted into evidence. The trial transcript is lengthy to say the least.

Following the trial but prior to closing arguments of counsel, plaintiffs sought a preliminary injunction restraining the promotion of seven sergeants. That motion was denied on June 14, 1984. Closing arguments were heard on July 6, 1984. This Court is now prepared to rule on this matter. Pursuant to its obligations under Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

III. *History of Discrimination in the Columbus Division of Police*

A. *Organization of the Division*

A brief explanation or description of the organizational structure of the Division may prove to be helpful in understanding the discussion that follows.

Section 97 of the City Charter (Jt.Ex. 1) establishes the Department of Public Safety composed of the Divisions of Police and Fire. Prior to January 1, 1981, the Division of Police maintained a set of procedural rules known as General Orders and a set of policies known as Rules of Conduct. (Jt.Ex. 3 and 5.) On January 1, 1981, the Division replaced these with a formal directives system (Jt.Ex. 7). Each officer receives copies of these directives as well as Daily Bulletins printed by the Division. These various documents will be referred to from time to time.

Additional sections of the City Charter describe in detail the organizational structure of the Police Department and the powers and duties of those individuals responsible for supervision of the Division, including the Mayor, the Safety Director, and the

Chief of Police. Based upon the evidence adduced at trial (Jt.Ex. 1, 3, 5 and 7), flow charts, which graphically depict the organizational structure of the Division, have been appended to this opinion.

That structure from time to time has changed, the most recent change was the implementation of a "midwatch," a shift which reports during the peak crime hours of 6:30 p.m. to 3:30 a.m. In addition, the terms used to describe the organizational structure, or parts thereof, have changed from time to time. In an effort to be consistent, the Court has undertaken to use throughout this opinion the following set of descriptive terms and designations.

The Division of Police is divided into approximately five subdivisions: Administrative, Investigative, Service, Special Operations, and Field Operations. Those subdivisions report to the Executive Branch of the Division of Police which operates under the command of the Chief of Police and his staff and includes three specialized bureaus: Internal Affairs Bureau, the Legal Bureau, and the Inspector's Bureau. Each of the five subdivisions, reporting to the Executive Branch, are further divided into Bureaus. For example, the Investigative Subdivision is divided into the Detective Bureau, the Juvenile Bureau, the Narcotics Bureau, etc. Similarly, the Administrative Subdivision, for example, is divided into the Community Relations Bureau, the Training Bureau, etc.

The Field Operations Subdivision is further divided into Companies, specifically A, B and C Company, each of which represents a shift to which uniformed personnel are assigned. In some cases, Bureaus are further divided into squads or units, denoting the smallest specialized group in the Division.

In the past for operational purposes, the Division of Police divided the City of Columbus into four zones which approximated the four quadrants of the city—northeast, northwest, southeast and southwest. Those zones were further divided into approximately sixteen precincts. Officers from time to time refer to substations in these various precincts.

As part of a recent reorganization effort, the City has been redistricted and these zones and precincts have been altered somewhat. A map of the precincts and zones in effect at the time of this litigation and a map of the precincts as they will appear under the proposed redistricting plan are appended hereto as well.

B. *History of Discrimination*

In order to fully understand the Court's disposition of this matter it is necessary to take a hard look at the history of the Columbus Division of Police and its past record in the area of equal employment opportunity. A number of matters discussed herein predate March 1972, the date on which Title VII became applicable to municipalities like the City of Columbus. Others predate the original 1964 passage date of the Civil Rights Act and still other incidents are more recent. All the matters which will be discussed help place in context the Court's later discussion of the liability of these defendants.

At this point the Court pauses to note that many aspects of this historical discussion are disturbing. It is not the Court's purpose herein to unearth long-since buried skeletons or to wag an accusatory finger at the defendants. As the Court has already noted, the defendants have made many strides in the equal employment opportunity area over the years. This progress will not and should not be overlooked. Nonetheless, it is the Court's obligation to determine whether, keeping in mind the history of the Division, the defendants' efforts have resulted in compliance with all the requirements of the law.

The evidence at trial established a pattern of overt and frequent segregation and discrimination on the basis of race in the Division of Police both prior to and following the time that Title VII became applicable to municipalities in 1972.

The first black police officer was hired by the Columbus Division of Police in 1895. And while blacks have been represented on

the Division since that time, the number of black officers has been significantly out of proportion to the number of black citizens in the City of Columbus. This pattern of discrimination in hiring resulted in a judicial determination of unlawful discrimination in hiring in 1975 in *Haynie v. Chupka, supra.*[1]

Black officers who managed to overcome obstacles to hiring encountered difficulty as members of the Division. Beginning with the testimony of former Inspector Harvey Alston, the second highest ranking officer in the Division of Police between 1954 and 1962, the evidence of instances of discrimination in the Division is overwhelming. According to Inspector Alston, whose testimony was corroborated by other witnesses knowledgeable concerning Division policies, in particular journalist John Coombs and now Deputy Chief James Jackson, blacks were historically excluded from certain assignments in the Division. Initially, black officers were relegated to foot patrol in black neighborhoods. Later, in the late 1940's and early 1950's when blacks were eventually assigned to cruisers, they were assigned to patrol black neighborhoods with black partners in cruisers without radios. (Tr. 3/14 at 93–99.) Blacks were not permitted to work on police vans or wagons used to transport prisoners well into the late 1960's. The opportunities for black officers in special bureaus were virtually nonexistent. Blacks were excluded entirely from the Detective Bureau with the exception of four slots set aside for black officers on the pawn shop detail. (Tr. 3/23 at 26–30.)

Many veteran officers, who testified during the course of this lengthy trial, confirmed the existence of these and other discriminatory practices in the Division. Virtually every senior black officer testified that as a matter of general practice in the 1960's and even to some extent in the 1970's, blacks were excluded from wagon assignments, were not permitted to work integrated cruisers and were by and large assigned to patrol in predominantly black neighborhoods. There was testimony that when Officer David Vines had occasion to make inquiry about a wagon assignment, he was told by a lieutenant that "We [referring apparently to the Division] don't need no sambos on the wagon." (Tr. 3/13 at 77–84.) Other black officers' requests for wagon assignments were also refused or ignored. More disturbing perhaps is the evidence that rather than assign a black officer to a wagon if a white officer were unavailable for that assignment, there were occasions when the wagon would not be sent out at all. (Tr. 3/30 at 5–7.)

Veteran officers also substantiated the existence of a Division practice of refusing to integrate cruisers and wagons or to assign a black and a white officer to the same foot patrol. When in 1969 now Deputy Chief James Jackson questioned the Division's refusal to integrate wagons, he was told by a captain that integration would only give you a "nigger and a hillbilly." (Tr. 3/30 at 9–11.) Because of this policy, there was evidence that black officers would be sent out on patrol alone if another black officer was unavailable to work with that officer. (Tr. 3/13 at 105–106.)

Blacks encountered similar obstacles in attempting to obtain other assignments outside of patrol. For a number of years blacks were excluded from the Traffic Bureau, as well as from Academy assignments. In addition, no black has ever been assigned to the crime scene search squad.

Perhaps nowhere were obstacles to black officers more apparent than in assignments to SWAT. Numerous members of plaintiffs' class testified concerning attempts in the 1970's to obtain SWAT assignments. A black officer, now a sergeant, attempted in 1975 to apply for an assignment to SWAT. At that time, the commander of SWAT, Lieutenant Richard Foor, later Captain Foor, told the black officer that as long as he was the SWAT Commander he would have "no niggers on SWAT" unless

---

1. Since 1975 the Division's strong efforts to recruit and hire black officers has resulted in a substantial increase in the number of blacks employed as police officers.

it was ordered by the federal court. (Tr. 4/3 at 50.)

With respect to uniformed officers, historically and to some degree at present, black uniformed police officers are also assigned to black neighborhoods. The defendants claim that this assignment pattern is an attempt to meet the needs and desires of the black community and individual black officers. Certainly, as a policy matter, it may make some sense to assign *certain* black officers to *certain* black neighborhoods in the hope that a common or shared experience will facilitate the development of better community relations.

The defendants, however, overlook some of the more troublesome aspects of the Division's historical practice of assigning black officers to black neighborhoods. The difficulty with such a practice arises because of the underlying assumption that black officers must work in black neighborhoods in order to be effective without any evidence of that being the case. From the facts of this case, it appears that the historical practice of assigning black officers to black neighborhoods is an anachronism which is being abandoned by the Division.

In addition to the foregoing evidence of the historical discriminatory treatment of black officers, the Court, with some reluctance, believes that it is necessary to review at least some of the substantial evidence admitted at trial concerning overt expressions of racial animus. An exhaustive treatment of the racial attitudes of the members, and in some instances supervisors, of the Columbus Division of Police will not be undertaken here. Nonetheless a few pertinent examples will be helpful in understanding the Court's findings and conclusions in this case. The value of this evidence is not limited to its historical significance. As will be noted, many examples of racial animus are of a more recent vintage.

The evidence can only be described as overwhelming with respect to the frequent and unhesitating use of the word "nigger" as well as other racially derogatory expressions. These expressions were not simply used verbally but rather they were found scrawled on desks at the training academy, on bulletin boards, in the restrooms, and on the walls of various substations. (Tr. 3/14 at 129–134; Tr. 3/15 at 35–46; Tr. 3/27 at 127–129, 188–189; Tr. 4/2 at 166, 167.)

Of perhaps the greatest concern was the testimony indicating the use of racial remarks or stereotypes, as well as the appearance of racial graffiti, at the training academy. (Tr. 3/28 at 50–56.) For example, in a welcoming speech given to at least one academy class a Captain reminded the cadets that while the Division of Police was forced to accept blacks and females, they did not have to keep them. (Tr. 3/27 at 86; Tr. 4/19 at 56–57.)

After leaving the academy many officers encountered further, in some cases more egregious, examples of bigotry. A black female officer testified concerning an incident in which two white officers presented her with a bunch of bananas, their not so subtle way of indicating that they believed her to be of ape ancestry. (Tr. 3/12 at 4–9.)

A former white officer testified about his futile attempt to be assigned to work with a black officer, and a lieutenant's warning to the white officer that his continued association with black officers would result in his going nowhere in the Division of Police. This warning was given in 1973.

In 1978 the white officer resigned when he learned of the promotion of Lieutenant Richard Foor to captain. (Tr. 4/3 at 60–65.) Captain Foor was the former SWAT Commander who had on a prior occasion indicated that he would not hire blacks for SWAT. Captain Foor's promotion occurred shortly after the Division received charges concerning Foor's racist remarks. (Tr. 4/3 at 60; Tr. 3/30 at 76.)

In addition, two other white officers testified concerning their encounters with racism in the Division of Police. Both officers testified that while being given a physical exam sometime in 1980 a city-employed physician made remarks concerning his efforts to find medical reasons to disqualify

blacks for Police Division service. (Tr. 3/15 at 6–11.) Both officers wrote letters concerning this incident. One officer even advised the Civil Service Commission, both verbally and in writing, about the racist remarks of the city physician. Notably, neither officer received any response to his or her letter.

The Court has found its review of much of this testimony bothersome and at no time was it more so than when the Court considered the experiences of another black officer. He testified about his encounters with what plaintiffs describe as racial hazing. While he was assigned to the 8th Precinct in 1979, the black officer was frequently referred to as "token" or "brillo pad" by his fellow officers and his supervisors, including a sergeant. He was often sent on false calls, sometimes at remote locations. On one occasion after being given directions to investigate a suspicious person, the black policeman arrived at the scene only to find a statue of a black man carrying a lantern. On yet another occasion, six of the black officer's colleagues wore white sheets and staged a cross burning in what they characterized as "a joke."

### IV. *Other Findings*

Plaintiffs allege that defendants have engaged in racially discriminatory conduct in the areas of promotions, transfers and assignments, discipline, and with respect to other terms and conditions of employment. More specifically, plaintiffs allege that defendants have engaged in a pattern and practice of discrimination and further that various policies and practices of the Division of Police have a disparate impact on black officers in the Division. With respect to promotions, plaintiffs allege that the civil service sergeants examination, as well as the five- and later three-year time-in-service eligibility requirements are discriminatory. Plaintiffs have produced statistical evidence to support these claims.

Similarly, with respect to assignments and transfers, plaintiffs allege that a three-year time-in-grade requirement in order to be eligible for receipt of a transfer disparately impacts blacks. Plaintiffs also allege a pattern and practice of excluding black officers from or limiting their number with respect to certain, much-sought-after assignments. Plaintiffs further allege a pattern and practice of discriminating against black officers in the imposition and nature of discipline imposed. Statistical evidence was adduced in support of these latter claims as well.

Plaintiffs allege discriminatory treatment with respect to various other terms and conditions of employment, such as shift assignments and days off. Also, plaintiffs claim to suffer from the discriminatory effects of defendants' no-beard policy. Finally, plaintiffs allege an atmosphere of intolerable racism which makes it difficult, if not impossible, for black officers to perform their duties.

### A. *Role of Statistics*

Statistical evidence is typically utilized in class action lawsuits similar to the case at bar in an effort to establish a *prima facie* case of a pattern or practice of unlawful discrimination or to prove that some selection device has a disparate impact on a class of protected persons. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). There can be little doubt that statistical evidence plays and will continue to play an important role in cases in which the existence of discrimination is a disputed issue. *Id.* at 340, 97 S.Ct. at 1856; *Contreras v. Los Angeles*, 656 F.2d 1267 (9th Cir.1981); *Davis v. Califano*, 613 F.2d 957 (D.C.Cir.1979). As the Supreme Court has acknowledged

> Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community …

*Teamsters, supra*, 431 U.S. at 340, 97 S.Ct. at 1856.

At the same time, however, to carry evidentiary weight statistics must be relevant, material and meaningful. Moreover, a court must keep in mind considerations which may detract from the value of such evidence.

In this vein, the Supreme Court has also noted that statistics come in infinite varieties and "[i]n short their usefulness depends upon all of the surrounding facts and circumstances." *Teamsters, supra,* 431 U.S. at 340, 97 S.Ct. at 1856; *See also Stastny v. Southern Bell Telephone & Telegraph Co.,* 458 F.Supp. 314, 324 (W.D. N.C.1978) *aff'd. in part and rev'd. in part,* 628 F.2d 267 (4th Cir.1980).

The determination of the role and weight of any statistical evidence must be made on a case-by-case basis. In reviewing statistical evidence and its supporting data the Court must give consideration to and evaluate fairly conflicting opinions and hypotheses and temper any of its conclusions or opinions with common sense. S. Agid, *Fair Employment Litigation: Proving and Defending a Title VII Case,* 540–41 (2d ed. 1979). While some guidance in this area is available from decisions of other courts which have engaged in careful and thorough analysis of statistical evidence and supporting data, *see, e.g., New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) and *Chance v. Board of Examiners,* 458 F.2d 1167, 1173 (2d Cir.1972), even those courts have been forced to acknowledge that in the final analysis the task facing the court is often difficult. In the latter cited case, the court aptly noted that

> After all the technical statistical jargon like 'one-tail' or 'two-tail' tests and 'Chi Square' ... as well as the less esoteric numbers and percentages were placed before the trial judge, it was his job to resolve the issues.

*Chance, supra,* 458 F.2d at 1173.

In the discussion which follows, it should be remembered that legal significance is not necessarily the same thing as statistical significance. *See* Hallock, *The Numbers Game—The Use and Misuse of Statistics in Civil Rights Litigation,* 23 Villanova L.Rev. 5, 12 (1977–78). And while the Court concludes that the statistical evidence in this case aids plaintiffs in their proof of a *prima facie* case, the Court's analysis of and conclusions concerning the issues in this case are not based solely upon the numbers and percentages discussed hereinafter.

The Court heard testimony from a number of experts in this case. Needless to say, the conclusions reached by these experts appeared to depend in large part on which side produced them. Prior to analyzing the specific conclusions reached by each of the experts, the Court will attempt to summarize the way in which each of the experts performed his analysis of the data. Thereafter, the data as it relates to each specified area of employment will be discussed in greater detail.

Plaintiffs presented the testimony of two statistics experts, Dr. Charles Cranny and Dr. Wayne Villemez. Basically Dr. Cranny testified concerning the promotional examinations, the time-in-service eligibility requirements, and the job relatedness of the examinations. Dr. Villemez's testimony, on the other hand, was concerned by and large with an analysis of the data as it related to assignments, transfers, discipline and other terms and conditions of employment. Dr. Cranny rendered an opinion based in part upon the performance of a traditional Chi-square analysis of the promotional data. Dr. Villemez calculated binomial probabilities in determining whether there was any statistically significant difference between black and white officers in the area of assignments, transfers, discipline and terms and conditions of employment.

Dr. Glen Milligan, defendants' expert witness, also performed a Chi-square analysis of data in an effort to determine any statistically significant difference in the treatment of black and white officers in the areas of promotions, transfers, assignments, discipline and terms and conditions of employment.

Dr. Milligan obtained much of the data, upon which he based his analysis, from Sergeant Renshaw of the Division of Police. Dr. Cranny also used data provided by the Division of Police when analyzing the impact of the 1976, 1978, 1980 and 1982 sergeants examination. Dr. Villemez obtained the data upon which he based his analysis from plaintiffs' witness, Tim Wagner.

Tim Wagner, a computer consultant, designed a data base and placed therein what he believed to be the available relevant data. Wagner obtained at least some of his data from Seniority Rosters, various assignment bulletins from 1974–1983, and incident records for currently-employed officers.

Using these various materials, Wagner created what he referred to as a P–Base file in which he entered the badge number, name, and seniority date for each officer. Then Wagner created an assignment file from the assignment bulletins referred to above. Units, subdivisions, days off and shift assignments were coded to simplify the task of entering this data into the assignment file. A third file was constructed in order to record the data relating to discipline. The computer tapes, upon which Wagner placed this data, were then sent to Dr. Villemez for analysis.[2]

It should be noted that Wagner stated that he took steps to validate the data which he entered on the tapes and everything placed on the tapes was double-checked. Despite these precautions, defendants claim that there are errors and inaccuracies in the data base which render the analysis based upon such data base suspect. The alleged errors in the data base can be classified as either (1) errors which were transposed from errors in the original materials provided by defendants or (2) errors which occurred when the data was transcribed from the defendants' material to the computer tape and then again transcribed when received by the statistician. While the Court is not unconcerned with these matters, a few pertinent observations should serve to dispel any concerns with respect to the reliability of this data generally. At various points in this opinion, the Court discusses specific problem areas with this data.

First, as a general matter, insofar as errors are traceable to errors in the materials provided by defendants to plaintiffs, it is the defendants and not the plaintiffs who bear the risk of any inaccuracy in some of the materials they provided to plaintiffs. If, for example, data entered on the computer tape based upon defendants' interrogatory responses proves to be inaccurate, plaintiffs should not suffer since they made the effort to obtain accurate information. With respect to the second type of error, i.e., possible errors in transcription of data from defendants' record to the computer tapes, the Court finds insufficient evidence to suggest that such errors were frequent. Certainly, there is insufficient evidence of so many errors of this sort to warrant the wholesale rejection of plaintiffs' testimony regarding this data.

### B. Promotions

The Court will now discuss the statistical and other evidence as it relates to specific areas of the employment relationship being challenged by plaintiffs. The first area the Court will consider is promotions.

A promotion is defined in Division directives as a "change from a position in one class to a position in a different class having greater authority and responsibility and a higher maximum rate of pay." Jt. Ex. 7. All promotions, including the selec-

---

2. Wagner checked much of his data after it was entered on the computer tapes sent to Dr. Villemez. Wagner ran computer printouts of the information contained in plaintiffs' P-base file and those printouts were then checked against the original data sources for accuracy. The computer printouts run by Wagner included lists of all black and white officers (Pl. Ex. 64 and 65), assignment histories for all black and white officers (Pl. Ex. 66 and 67).

In addition since the names of certain units, bureaus and subdivisions changed from time to time, Wagner prepared a correlation table as a cross-reference device so that analysis of assignments was consistent over the years.

tion of the Chief of Police, are made by the Public Safety Director, at his discretion, and often with the advice and counsel of subordinates.

Promotions in rank in the Division are generally made in the following order: from police officer to sergeant, from sergeant to lieutenant, from lieutenant to captain, from captain to deputy chief, and finally to chief of police. The chief is selected from among deputy chiefs who have been in that rank for at least one year. Promotions to deputy chief are made from among captains who have been in that rank for one year. No civil service exams are given for the chief or deputy chief position.

Captains are selected from a Civil Service eligibility list consisting of lieutenants who have been in that rank for one year and who have passed the captain's examination. Competitive examinations are given for lieutenants and sergeants positions as well. Given the almost complete absence of black officers in the upper ranks of the Division, there was virtually no evidence available concerning the effects, if any, of these testing procedures on black officers. Most of the evidence concerning promotions focused on the sergeants promotional examination.

Police officers on the force three years are permitted to sit for the sergeants examination. Until 1977, police officers were required to have five years' experience on the force to be eligible to sit for the sergeants examination. Sergeants in rank one year may take the lieutenants examination.

After an examination is administered it is graded by the examiners from the Civil Service Commission. Those passing the exam are placed on an eligibility list which is then certified by the Civil Service Commission to the Safety Director, who then may make a promotion from the top three candidates.

Prior to certifying the list to the Civil Service Commission but after the grading of the examinations, seniority points are added to each candidate's raw score. No discussion has taken place nor have any objections been raised concerning the use of seniority points and indeed any attempt to do so would be difficult at best and futile at worst. However, other aspects of the promotion and examination procedure have been the subject of substantial testimony.

At the outset, it should be noted that relevant to this case are the Civil Service sergeants promotional examinations administered in 1976, 1978, 1980 and 1982. Eligibility lists were certified to the Safety Director following the examinations in each of those years.

### 1. *Statistics Re: Promotions*

Plaintiffs' chief expert witness concerning the sergeants promotional examinations for each of the above-noted years was Dr. Cranny, an industrial psychologist since 1967 and an associate professor of psychology at Bowling Green State University. Dr. Cranny has substantial expertise in statistics and EEO matters and has testified and done consulting with respect to the development of selection devices in the equal employment opportunity area.

Dr. Cranny examined various aspects of the promotional procedure employed by defendants, more specifically the time-in-grade eligibility requirement, the examinations, and job analysis, in an effort to determine whether any aspect of the promotional procedure adversely affected black officers. Dr. Cranny concluded that the time-in-grade eligibility requirement and the sergeants promotional examinations for the years 1976, 1978 and 1982 had an adverse impact on blacks.

First, with respect to the time-in-grade eligibility requirement for taking the sergeants examination, Dr. Cranny concluded that such a requirement, five years prior to 1977 and three years thereafter, had the effect of excluding greater numbers of blacks than whites from the promotional process. No one seriously disputed this fact. In fact, there was testimony that the Safety Director, the Chief of Police and the Civil Service Commission recognized that

any time-in-grade requirement would adversely impact blacks who began entering the Division in 1975–1976.

Dr. Kriska testified concerning the five-year and three-year time-in-grade requirements:

Q. Now, in '76, there was a five-year requirement for those who wanted to take the police sergeant's exam; isn't that correct?

A. That's correct.

Q. There was a Civil Service requirement; isn't that true?

A. That's correct.

Q. Did the Civil Service Commission ever conduct an analysis or study to determine whether that five-year requirement was related to job performance?

A. The police sergeant job analysis that was conducted in 1975 addressed the issue. It was certainly not the primary focus of that job analysis, but as I recall, some legal cases were reviewed, and based on that legal review, the requirement was changed from five years to three years.

Q. Okay. The legal cases were reviewed, but you did not do a job analysis to determine, or any analysis or study to determine whether the five-year requirement was related to successful—

A. There is not, no analysis specifically on the Columbus police sergeant.

Q. And in '78, of course—you did change it in '77; right?

A. Correct.

Q. And it was changed from five years to three years?

A. Correct.

Q. And the reason for that change is that you decided that five years was too high; isn't that correct?

A. I think it's very difficult to set a cutting point like that. Administratively, the Commission does need some criteria by which to decide who is eligible to take a promotional examination and who is not eligible, but it's very hard to say that the five years is inap-

propriate and three years is appropriate.

Q. But you—okay. You decided that three years was appropriate in '77?

A. The Commission did, yes.

Q. Based—

A. It took Commission action to make that change.

Q. Based on the recommendation of the Division of Police?

A. I'm not sure whether the police recommended it or whether the staff recommended it. It might have been a staff recommendation. In fact, as I recall, in the job observations, the police sergeants were very, very comfortable with the five-year requirement, and I think it's probably more a Civil Service staff recommendation that the three years be considered as, basically, a form of affirmative action.

Q. Okay. Then in '78 and '80 and '82, there were—was a requirement—was there not—that one had to be a police officer for three years before being eligible to take the sergeant's examination?

A. That's correct.

Q. Was there ever any study done by the Civil Service Commission to determine whether that three-year requirement was related to successful job performance?

A. Not that I—only the review of what's happened in other cities.

Q. The review of the literature; is that correct?

A. That's correct, yes.

(Tr. 123–125.)

■ Despite the Division's recognition of the potential and actual adverse impact of this time-in-grade eligibility requirement, defendants contend that this requirement constitutes a *bona fide* seniority system, thus insulating it in large part from an attack by plaintiffs. Invocation of the concept of a *bona fide* seniority system cannot and should not become a talismanic substitute for analysis. The Court finds no merit to defendants' reasoning *post hoc, ergo*

*propter hoc* that the time-in-grade eligibility requirement is a *bona fide* seniority system.

First, not every time-in-grade eligibility requirement is transformed into a seniority system merely by virtue of the fact that time on the job is involved. Nowhere have the defendants identified any written seniority policy, procedure or system which incorporates this time-in-grade requirement.

Finally, the evidence does suggest that if in fact a seniority system existed at all, it manifested itself when seniority was taken into account by adding seniority points to the many successful applicants for purposes of ranking those applicants. The fact that seniority points were being used in the promotional process casts serious doubt on defendants' contention that the time-in-grade eligibility requirement was also a *bona fide* seniority system. In sum, the Court finds no merit to defendants' attempt to justify the time-in-grade eligibility requirement as a *bona fide* seniority system despite that requirement's adverse impact.

Next, the Court turns to an analysis of the sergeants promotional examinations for the years 1976, 1978, 1980 and 1982. Neither Dr. Cranny nor any other witness testified that the 1980 sergeants examination had an adverse impact, and the Court believes that the statistical evidence concerning that year's examination fails to establish any discriminatory impact.

Turning to the examinations for the remaining years, Dr. Cranny arrived at his opinion of adverse impact by using three statistical methods of analyzing the relevant data. The data used was derived largely from Jt. Ex. 87, 91, 92, 93. First Dr. Cranny analyzed the data using the 80% or 4/5's rule of the Uniform Guidelines on Employee Selection Procedures (hereinafter "Uniform Guidelines").[3] When using the 80% rule, which is the Uniform Guidelines "rule of thumb concerning adverse impact," one attempts to determine adverse impact of selection procedures by comparing the selection ratios of the two groups in question—in this case black officers and white officers. Stated rather simply, if the selection ratio of blacks divided by the selection ratio of whites is less than 80%, then the 80% or 4/5's rule is violated and there is adverse impact. In this case, Dr. Cranny concluded that the 80% or 4/5's rule was violated and that the 1976, 1978 and 1982 sergeants examinations had an adverse impact on black officers.

While as has already been noted, the 80% rule is merely a "rule of thumb," some courts suggest that violation of that rule alone is sufficient to establish a *prima facie* case of discrimination. *Williams v. Vukovich,* 720 F.2d 909, 926 (6th Cir.1983); *Guardians Ass'n. v. Civil Service Commission,* 630 F.2d 79 (2d Cir.1980). The Court need not decide the issue of whether violation of the 80% rule alone is sufficient to establish a *prima facie* case of discrimination since there is additional statistical

---

**3.** Throughout the course of this opinion the Court will frequently refer to the Uniform Guidelines on Employee Selection Procedures. The Uniform Guidelines became effective on September 25, 1978, 43 Fed.Reg. 38290–38315 (Aug. 25, 1978), and superceded the prior employee selection Guidelines sometimes referred to as the 1970 EEOC Guidelines. The Uniform Guidelines represent a revision and amplification of the EEOC Guidelines but signal little change in what is required in the area of selection procedures. *See* 29 C.F.R. Part 1607 *et seq.* Also referred to from time to time in this opinion and in the parties' briefs are the Federal Executive Agency Guidelines on Employee Selection Procedures (FEA Guidelines), 28 C.F.R. § 50.14, 41 C.F.R. § 60–3. These guidelines

govern federal employment and therefore are not applicable in this case. Nonetheless the FEA Guidelines mirror the EEOC and Uniform Guidelines, and therefore may constitute a useful analogue from time to time. See Pl. Ex. 9, 10, 463, 464.

In the pages that follow, the Court will refer almost exclusively to the Uniform Guidelines when referring to regulations involving employee selection procedures. Obviously the Uniform Guidelines were not in effect until 1978 and therefore cannot be used with respect to matters arising prior to that time. Nonetheless for simplicity's sake, the Court consistently refers to the Uniform Guidelines which term should be deemed to encompass the EEO Guidelines, whenever applicable.

and other evidence in this case to warrant that conclusion.

In addition to the foregoing statistical analysis, Dr. Cranny performed a Chi-square analysis in an effort to determine the relationship between race and passing the sergeants promotional examinations administered in the years 1976, 1978 and 1982. Dr. Cranny also analyzed the difference between the mean scores of blacks and whites for the sergeants exams for 1976, 1978 and 1982 in further effort to determine the adverse impact of those exams.

For each of the years in question—1976, 1978 and 1982, Dr. Cranny concluded that the differences in mean scores of blacks and whites was statistically significant. Using what is known in the jargon as a t (letter "t") statistic, Dr. Cranny stated, to paraphrase him in rather simplistic terms, that the mean scores of blacks who took the exam were lower than the mean scores of whites who took the exam thus giving the overall impression that blacks did not score as well as, and found the exam more difficult than, their white counterparts. (Tr. 3/19 at 78–80; 154–160.)

Dr. Cranny's analysis of the relative passing rates of blacks and whites also suggests that the exam in question had a disparate impact on blacks.[4] Using rather traditional two-by-two Chi-Square tables, Dr. Cranny calculated the probability of obtaining the difference in selection or passing rates between blacks and whites by chance. For the years 1976 and 1978 Dr. Cranny found that the probability of obtaining the difference between black and white passing rates by chance was less than .05. The probability of obtaining the difference in passing rates by chance on the 1982 examination was .08, a little more than the .05 level of significance but less than the .10 level of significance.

The Court pauses to note at this point that there are no hard and fast rules among statisticians as to what constitutes an absolute level of significance. Some statisticians performing Chi-square tests set .05 as the level of significance. *See* Smith and Abram, *Quantitative Analysis and Proof of Employment Discrimination*, 1981 U.Ill.L.Rev. 33 at 43. Others, however, are critical of using .05 or any other level as an absolute standard of statistical significance. Harper, *Statistics as Evidence in Age Discrimination*, 32 Hast. L.J. 1347, 1354 (1981); Baldus and Cole, *Statistical Proof of Discrimination*, § 9.2 at 101–103 (1983 Cumulative Supp.). The Court believes, without attempting to resolve the controversial debate raging among those much more knowledgeable than this Court about such matters, that generally .05 is an appropriate level at which to judge statistical significance. The Court candidly admits that its conclusion in this regard is somewhat arbitrary; nonetheless, given the lack of serious disagreement between the parties concerning this matter, the choice of a .05 level of statistical significance seems both fair and rational.

■ With respect to the 1982 sergeants exam, the Court has noted a level of statistical significance or a probability of .08. This fact does not alter the Court's conclusion that this examination had an adverse impact on blacks. While the probability of obtaining a difference in passing rates was slightly greater than .05, Dr. Cranny concluded, and this Court finds, that this examination had an adverse impact using the 80% rule. Moreover, the difference in mean scores between blacks and whites was statistically significant. In sum, the Court believes there is sufficient evidence of a *prima facie* case of discrimination with respect to the 1982 sergeants promotional examination despite a Chi-square

4. Dr. Cranny's Chi-square calculations can be summarized as follows:

| Exam Date | $x^2$ | z (std. deviation) | P (probability) (one-tail) |
|---|---|---|---|
| 1976 | 4.61 | 2.15 | .16 |

| Exam Date | $x^2$ | z (std. deviation) | P (probability) (one-tail) |
|---|---|---|---|
| 1978 | 4.09 | 2.02 | .16 |
| 1980 | N/A | N/A | N/A |
| 1982 | 1.95 | 1.40 | .08 |

(Tr. 3/19 at 67-70, 145.)

probability for that examination which exceeds .05.

The Court also pauses to note at this point that Dr. Cranny's probability calculations are one-tail probabilities. Using a two-tail test, the probabilities discussed in the foregoing paragraphs would be approximately double those reported by Dr. Cranny. In the years 1976 and 1978, even using a two-tail test of probabilities, the likelihood of obtaining the difference in passing rates by chance was still under .05. (Tr. 3/19 at 79, 144–148.)

There was substantial testimony and discussion during the course of trial concerning the propriety of using a one-tail as opposed to a two-tail test of probabilities. At times the debate over this issue was reminiscent of a classic battle of the experts.[5]

Some statisticians use a one-tail test while others use a two-tail test in formulating an opinion about statistical significance. Friedman, *Introduction to Statistics*, 146 (Random House 1972). Statisticians themselves candidly admit that the choice is often arbitrary. W.B. Connally & D.W. Peterson, *Use of Statistics in Equal Employment Opportunity Litigation* (1980). Social scientists seem slightly more prone than mathematicians to the use of a one-tail test, although this is not universally true. Baldus & Cole, *supra*, § 9.2 at 101–103 (1983 Supp.); D.H. Kaye, *The Numbers Game: Statistical Inference in Discrimination Cases*, 80 Mich.L.Rev. 833, 841 (1982); H.M. Blalock, *Social Statistics* (McGraw Hill, 2d ed. 1972).

Frankly the Court is somewhat at a loss to understand the nature of this dispute in the context of this case. Common sense would seem to dictate use of a one-tail test since the question one is attempting to answer is one directional (*i.e.,* is there evidence that blacks are being treated less favorably than whites at a statistically significant rate?). (Tr. 3/19 at 71–75.) As the Court has already noted in the years 1976 and 1978 even using a two-tail test of prob-

abilities, the likelihood of obtaining the difference in passing rates by chance was still less than .05. The Court has already discussed at some length, and will not repeat the discussion concerning, probabilities with respect to the 1982 examination.

Despite the foregoing, defendants argue that use of the one-tail test favors plaintiffs' viewpoint and is a method of manipulating data to prove a desired result. The Court does not find it necessary to decide whether use of a one-tail test unjustly facilitates a finding of significant results. While the Court makes reference in the pages which follow to the one-tail test performed by plaintiffs' experts, the Court believes that substantially similar conclusions about the data can be reached by using a two-tail test.

Similarly, the Court does not find it necessary to reach any conclusions concerning defendants' argument that prior Supreme Court cases involving the use of statistics in EEO matters consistently use two-tail analysis, and that therefore two-tail tests alone are appropriate. *See Hazelwood School District v. United States*, 433 U.S. 299, 308–312, 97 S.Ct. 2736, 2741–44, 53 L.Ed.2d 768 (1977); *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The Court finds no evidence in either of the above Supreme Court opinions suggesting that in EEO matters a two-tail analysis should be used exclusively. The Court finds substantial evidence of a scholarly or academic nature suggesting the appropriateness of using a one-tail test in circumstances similar to those presented herein. (Tr. 3/22 at 22–25; Tr. 4/9 at 34, 204–207.)

In addition to the foregoing tests of statistical significance, Dr. Cranny attempted to garner knowledge concerning the level of black representation in supervisory positions by performing a *Hazelwood*-type analysis. In this regard, Dr. Cranny compared the proportion of black supervisors to the proportion of blacks in Metropolitan Columbus (see Pl.Ex. 27, 72) and concluded based upon the comparison that the proba-

---

**5.** *See e.g.,* novels by Mary McCarthy.

bility of having so few black sergeants was less than 1 chance in 10,000. (Tr. 3/19 at 168–171.)

Before moving on to a discussion of the criticisms of Dr. Cranny's analysis, it should be noted that Dr. Cranny was not alone in reaching the conclusions he reached. With respect to the 1978 examination, Dr. Kriska, chief of testing for the City of Columbus, also concluded that the difference in the mean scores and the passing rates of black and white officers was statistically significant using a two-tail test. (Tr. 3/15 at 118–121.) In fact, Dr. Kriska wrote a letter suggesting that further consideration be given to the sergeants examination since he believed the examinations "had an adverse impact on blacks." (Jt. Ex. 90.)

Dr. Wayne Villemez, plaintiffs' other statistics expert, also examined the promotional data. Dr. Villemez, a professor at the University of Illinois, also has substantial experience in use of statistics in the EEO area.

The results of Dr. Cranny's analysis of promotional data were reaffirmed in part by Dr. Villemez's binomial probability calculations. Dr. Villemez conducted a binomial probability analysis to determine whether, in the context of promotion decisions, there was any difference in treatment between black officers and white officers. Dr. Villemez began with the assumption that if there is equal treatment of black and white officers, one would expect that the rates of promotion for both groups would also be equal. *See Davis v. Califano,* 613 F.2d 957 (D.C.Cir.1979).

Dr. Villemez first calculated the white promotions rate and then calculated how many blacks one would expect to be promoted if, in fact, blacks were being promoted at the same rate as whites. Dr. Villemez next compared the difference between the expected number of promotions and the actual number of promotions and calculated the probability of this difference occurring by chance, "that is, how likely is it that we could get a difference this large if, in fact the black rate is the same as the

white rate." (Tr. 3/22 at 12.) If the number of standard deviations from what one would normally expect was greater than 2 or if the probability of this difference occurring by chance reached the .05 level of significance, then Dr. Villemez considered the results or probability to be statistically significant. Stated another way, Dr. Villemez attempted to determine whether the assumption of equal treatment should be rejected because of the substantial unlikelihood of finding so great a difference in the actual number of black promotions as compared to the expected number of black promotions by chance. Based upon his calculations, Dr. Villemez rejected the assumption of equal treatment, and concluded that from 1976 until present, there was a substantial statistical disparity between the actual and expected number of blacks promoted.

■ Defendants contend that the statistical disparity calculated by Dr. Villemez cannot be deemed to be the result of discrimination but rather is due to the large influx of black officers as mandated by this Court's order in *Haynie v. Chupka.* (Pl. Ex. 72.) The defendants' proffered justification for the statistical disparity in the rate of black as compared to the rate of white promotions may well be correct or at least a partial explanation for the disparity. Defendants argue that historically, the average time-in-grade for an officer promoted to sergeant is ten years or more. Therefore, defendants continue, since a large number of blacks did not enter the Division until 1975, less than ten years ago, one would not expect as many black sergeants. While this argument has a certain validity, it does not alone require this Court to conclude that blacks were not discriminated against in promotions. It is only one of many factors the Court has considered concerning the statistical analysis of promotions.

First, assuming there is some merit to defendants' contention in this regard, the Court remains doubtful that the influx of blacks into the department in 1975 and 1976, standing alone, would provide an ade-

quate justification for evidence of significant statistical differences mentioned above between black and white officers. Moreover, the fact that present discrimination in the area of promotions may be due in part to prior discrimination in the area of hiring does not render the former non-actionable.

In fact the present underrepresentation of black supervisors bolsters plaintiffs' contention of unlawful discrimination even if that underrepresentation is due in part to prior discriminatory hiring practices. After being ordered to remedy discriminatory hiring practices, defendants should have been more sensitive to the need to, and made an effort to, alleviate discrimination in other aspects of employment with the Division.

The conclusions reached by Drs. Villemez and Cranny with respect to the defendants' promotional procedures were attacked directly and collaterally by Dr. Milligan, defendants' statistics expert. Dr. Milligan, a professor of statistics at Ohio State University, clearly qualified as a statistics expert, although his experience with EEO matters was somewhat less than that of plaintiffs' experts. Dr. Milligan, like Dr. Cranny, performed a Chi-square analysis of the promotional data except that, unlike Dr. Cranny, Dr. Milligan used two-by-five or two-by-six Chi-square tables, reasoning that factors other than race should be taken into account in calculating the Chi-square. (Df. Ex. H–M.)

Dr. Milligan claimed that in performing his statistical analysis he attempted to determine whether the entire or overall promotional process operated to adversely affect black officers. In this regard, Dr. Milligan grouped together various components of the promotional process as indicated in defendants' exhibit H–M. This Court has no way of knowing how or why Dr. Milligan selected the various components of the promotion process to be includ-

ed in his analysis. For example, included in his analysis as a separate component were calculations concerning the number of blacks who failed to show up to take the sergeants exams. We have no way of knowing why that component was selected or why it was deemed an important consideration. Nor does this Court believe that this or certain other components considered by Dr. Milligan rise to the same level of importance as, for example, the passing rates on the examinations. In sum, the Court has substantial difficulty in adopting Dr. Milligan's analysis concerning the adverse impact of the promotional process.

The Court has other difficulties with Dr. Milligan's analysis. By grouping various component parts of the promotions process together, Dr. Milligan violated what statisticians refer to as the "assumption of independence." The assumption of independence requires that each of the component parts grouped together for the purpose of calculating probabilities be independent of every other component part. In other words, there should not be any overlap in the column or component headings in the two-by-five and two-by-six Chi-square tables. In this case the assumption was violated since persons in certain columns, for example the column headed "# passed exam," may also be counted again by virtue of their appearance in another column, for example, the column headed "# promoted." [6]

In large part the Court believes that Dr. Cranny correctly identified the type of analysis which should be performed when attempting to determine the disparate impact of a promotions procedure. The Court believes that the more appropriate question to ask in cases like the one at bar is whether any of the separate components of the promotional process have an adverse impact. Since discrimination may be proven even though the "bottom line" shows no

---

**6.** Similar difficulties arise with respect to Dr. Milligan's discussion of the number of degrees of freedom. Degrees of freedom basically refer to the number of components being measured. (*See* testimony of Dr. Charles Cranny, Tr. 4/20 at 64–70.) When using statistical tables, an increase in the number of degrees may make it more difficult to find disparate impact and may therefore amount to a manipulation of the data. (Tr. 4/20 at 64–70.)

statistically significant proof of adverse treatment, *Connecticut v. Teal*, 457 U.S. 440, 445–456, 102 S.Ct. 2525, 2529–2535, 73 L.Ed.2d 130 (1982), the more relevant analysis in this case is whether specific component parts of the promotional process adversely impacted a protected group.

■ Despite this Court's conclusions concerning the need to analyze component parts of the promotional process, Dr. Milligan maintains that even if he violated the assumption of independence, his calculations represent an accurate view of the treatment of black and white officers. Dr. Milligan testified that he has proven that the violation of the assumption of independence is irrelevant because of the use of what he refers to as the "Monte Carlo technique." Dr. Milligan was unaware, as is this Court, of any EEO case or other authority which indicates that the assumption of independence may be violated and then justified by use of the Monte Carlo technique. It is extremely difficult to understand how the Monte Carlo technique was used in this case. In sum, the Court is unpersuaded that the subsequent use of the Monte Carlo technique serves to justify the violation of the assumption of independence.

The Court finds that Dr. Milligan's results and violations of the assumption of independence may have affected the matters which he analyzed and that as a result meritorious objections have been raised concerning his statistical analysis. The Court finds that Dr. Milligan failed in his attempt to impeach or cast doubt upon the statistical analysis performed by plaintiffs' experts in the area of promotions.

Finally, the Court finds that the statistical analysis of plaintiffs' experts is bolstered by evidence concerning individual black officers in the department. Specifically, in the last 10 years, only 4 blacks have been promoted to sergeant.

Those blacks who received promotions to sergeant include: John Rippey (1974); Tom Hawkins (1976); David Crawford (1980); and Fred Robinson (1981). No black has been promoted to sergeant since May of 1981.

Of the 43 officers promoted to lieutenant between 1974 and 1984 only one was black—Tom Hawkins, who was promoted to lieutenant in 1980. In the last 10 years the only other black promoted in the upper ranks was Deputy Chief Jackson who was promoted from captain to deputy chief. Less than 3% of those promoted in the last decade have been black.

### 2. *Job Analyses and Validation Studies*

As will become apparent in the legal discussion which follows, once a court concludes that there is sufficient evidence to indicate, *prima facie*, that an examination or other procedure had an adverse impact on blacks, it is then incumbent upon defendants to produce sufficient evidence showing that the exam or procedure is job related.

■ Before addressing the job analyses performed with respect to promotional exams, the Court believes a brief discussion of the alleged job relatedness of the three-year, formerly five-year, time-in-grade eligibility requirements is in order. Job relatedness, as that term is used in Title VII litigation, simply means that a selection procedure or requirement is a reliable predictor of job performance. As previously discussed, the time-in-grade requirements had a disparate impact on blacks and therefore can only be justified if shown to be job related.

■ Neither the past or present police chief, nor anyone from the Civil Service Commission could satisfactorily explain the reason for a three year time-in-grade eligibility requirement. No attempt was made to demonstrate that such a time-in-grade requirement was job related or resulted in improved job performance. There was testimony that members of the job task force believed that the three-year time-in-grade eligibility requirement, which appeared to be the average time eligibility requirement in other police departments surveyed,

would strike the proper balance between experience and possible adverse impact. For example, defendants' witness Dr. David Kriska, chief of testing, testified that common sense dictated the need for some experience in supervision and that the job analysts simply made a judgment that three years was proper. (Tr. 3/15 at 123–128; Jt. Ex. 52.) In sum, this Court has no way of knowing how the job analysts made their subjective determination and therefore this Court has no basis for concluding that the time-in-grade requirement was job related.

Some time-in-grade undoubtedly is reasonable and necessary to become a sergeant, but whether it is one year, three years, five years, or some other number is a matter which has not been satisfactorily illustrated to the Court. In this regard, the Court does not wish to substitute its judgment for that of experienced police officers. However, the Court cannot make a judgment of job relatedness based upon the bald, unsupported conclusions of such officers. The Court must know the basis for those conclusions.

The Court next considers the job analysis as it relates to the actual steps taken to construct the sergeants examination for pertinent years, in an effort to make a judgment concerning the job relatedness of those exams.

Assessment of these examinations necessarily carries the Court into the difficult area of judging test validity. The study of testing techniques is not primarily a legal subject but is more appropriately relegated to the fields of psychology and education. Nonetheless, in the Title VII area, courts have little choice but to subject employment tests, which have a disparate impact, to judicial scrutiny.

In 1974–75, a job task force, consisting of Tom Hoskinson, Wayne Christie, Lewis Bernardi and David Kriska, was formed for purposes of performing a job analysis and constructing a sergeants examination for the Division of Police. Subsequently, Kriska was also involved in the preparation of the validation report for the 1978 sergeants exam.

The job analysts began the task of constructing the job analysis and examination by reading in-house Division publications and by interviewing and observing a number of sergeants in the Division at work. The analysts then generated a list of tasks which was edited by selected incumbent sergeants and lieutenants. The incumbents then generated a list of behaviors assumed to accompany or to be associated with performance of each task. The behaviors apparently were used to aid in interpreting the tasks but were not separately analyzed.

Ultimately, the job analysts came up with a list of 62 tasks. (Jt. Ex. 52.) At some point, the listed tasks were analyzed in terms of frequency, criticality and percentage of time necessary for performance. Thereafter, and it is unclear as to how this process took place, the job analysts constructed a list of "traits" that they believed were necessary to perform the 62 tasks. The original list of over 500 traits was eventually reduced in number for various reasons and presented to incumbents who were asked to rate the traits. (Jt. Ex. 52; see discussion of Primoff and importance ratings at pp. 7–11.) Traits were eliminated for a number of reasons including the following: (1) the trait was not amenable to testing; (2) the trait was tested by the exam situation; (3) no source material could be found to test the trait; and (4) all candidates were assumed to possess the trait. Apparently no attempt was made to evaluate the comparative importance of the traits eliminated from consideration. Eventually, based upon the incumbent's perception of the importance of the trait and based upon the number of tasks with which the trait was associated, test questions were constructed which allegedly attempted to test the candidates for that trait.

In preparing the 1978 and 1982 sergeants examinations, Dr. Kriska and the other test constructors repeated many of the steps taken to prepare the 1976 exam. Although

there is some question as to whether the job analysis was completed in time to be of use in construction of the 1976 exam (Jt. Ex. 54; Tr. 3/15 at pp. 50–60), the Court believes that there is sufficient evidence reasonably to infer that the 1975 job analysis provided the outline for the test plan in 1976, 1978 and 1982. The Court will therefore assume that to a substantial extent the job analysis was used by the test constructors when they wrote various questions for each of those exams. It is appropriate to note at this time that there was also testimony which indicated that the general experiences of the test constructors were significant factors in the examination construction process. (Tr. 3/15 at 53–60.)

■ The job analysis and test construction explained in the preceding paragraph was the subject of considerable testimony critical of the procedures. Similarly, the defendants' attempts to validate the sergeant's examinations as reliable indicators of performance also came under attack. Generally, a test may be validated, *i.e.,* shown to be job related, if the employer can demonstrate compliance with test validation procedures set forth in EEO and Uniform Guidelines as well as the accepted standards of the psychological profession. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 430–31, 95 S.Ct. 2362, 2377–78, 45 L.Ed.2d 280 (1975).

The EEO and Uniform Guidelines have been previously mentioned in connection with the ⅘'s rule of statistical significance. The EEO and Uniform Guidelines also contain substantial discussion about testing and validation strategies. Both the EEO and Uniform Guidelines rely on and refer to the *American Psychological Association's Standards of Educational and Psychological Tests and Manuals* (1974) (hereinafter "APA Standards"). The APA Standards were relied on by the parties and are referred to from time to time in the pages which follow.

The APA Standards and the Administrative Agency Guidelines recognize that there are a number of validation strategies, including content, criteria-related and construct validity, which an employer may use to establish the job relatedness of an examination.

In this case no real attempt was made by the defendants to validate the exam using criteria-related or construct validity. Such strategies are apparently inappropriate in these circumstances. *Guardians Association v. Civil Service Commission,* 630 F.2d 79, 93–94 (2d Cir.1980). The defendants do, however, maintain that the job analysis and the validation study demonstrate the content validity of these examinations. This Court cannot agree.

■ Stated rather broadly, content validity requires the demonstration of a direct relationship between the test contents and job contents. A test is content valid if the items being tested closely approximate the tasks to be performed in the position being sought by the candidates for promotion. *Albemarle, supra,* 422 U.S. at 430–35, 95 S.Ct. at 2377–80; *Washington v. Davis,* 476 U.S. 229, 247, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976).

The Court believes that the 1976, 1978 and 1982 exams failed to meet content validity standards in several respects. An examination is generally considered content valid if it consists of suitable samples of the essential knowledge, skills or behaviors composing the job in question. Uniform Guidelines, Section 14(C)4, 29 C.F.R. § 1607.14(C)(4) (see Pl.Ex. 9). The Uniform Guidelines further suggest that

[i]n the case of a selection procedure measuring a knowledge, skill, or ability, the knowledge, skill or ability being measured should be operationally defined.... [T]he knowledge being measured should be operationally defined as that body of learned information which is used in and is a necessary prerequisite for observable aspects of work behavior of the job ... [and] ... to performance of critical or important work behavior(s).

. . . . .

If a test purports to sample a work behavior ... the manner and setting of

the selection procedure and its level and complexity should closely approximate the work situation.

*Id.*

Initially, the job analysis failed to focus on the critical behaviors as is required by the Administrative Guidelines. The documentation in the job analysis fails significantly to analyze behaviors or to relate those behaviors to various tasks. The behaviors are not operationally defined as required by the APA standards (Pl.Ex. 8) and the Uniform Guidelines (Pl.Ex. 9, 10 and 463, 464).

Dr. Schmitt, an industrial psychologist since 1972 and a defense expert with respect to the validation of the sergeants examinations, (Df.Ex.HP) conceded that there were difficulties with the documentation of the relationship between the exams and tasks, traits and behaviors and admitted that the behaviors and traits were not really operationally defined. (Tr. 4/16 at 94–114.)

Even were this Court to assume, based upon some notions of pragmatism that certain behaviors are performed on the job, I have no way of knowing how the job analysts reached the conclusion that these behaviors are critical behaviors or for that matter which behaviors were considered more critical than other behaviors. Nothing in the job analysis satisfactorily explains how or why the analysts reached the conclusions they did.

In addition to assuming that certain behaviors are critical and job related, the job analysts apparently made a further inference that certain knowledge was associated with certain behaviors and a prerequisite to performing certain tasks. For example, the job analyst assumed that in order to perform the sergeant's job one would have to know arrest procedures. This Court, however, has no way of knowing the type or extent of knowledge of arrest procedures that is required in order for sergeants to perform their jobs. Nor does this Court have any reason to conclude or believe that such knowledge must be committed to memory rather than merely made readily available. Nothing in the job analysis indicates the level of knowledge of arrest procedures required by sergeants.

Not only is the extent of knowledge required by sergeants to perform their job unclear from the job analysis, but in addition this Court has no way of knowing how the job analysts arrived at the conclusion that a certain amount or particular kind of knowledge was required.

For instance, would it be sufficient for a sergeant to know that a suspect, who is in custody, must be read *Miranda* warnings prior to being questioned, or must the sergeant have these warnings committed to memory. Many officers apparently carry *Miranda* cards with the *Miranda* warnings printed thereon. If that is the case, then it could be argued, persuasively, that a sergeant need not commit those warnings to memory. On the other hand, perhaps a sergeant needs to understand the theoretical constitutional basis for the *Miranda* rule. In sum, based upon the job analysis and even further based upon testimony of the job analysts at trial, it is not at all clear how conclusions were reached concerning critical behaviors and associated knowledge.

More importantly, this Court believes that it is a fallacy to assume that because a behavior or skill is necessary, all knowledge "associated with" that skill are also necessary. For example, someone who is required to possess skill in operating a motor vehicle need not also be required to possess knowledge about the intricate workings of that automobile. In order to operate a motor vehicle it is necessary to know that one accelerates when the gas pedal is pressed down but it is probably not also necessary to know what proportions of air and gas are mixed in the carburetor in order for the engine to be engaged. While this example is somewhat of an exaggeration, the point is well made.

In a similar regard, it would be incorrect to assume that someone who knows about the history or mechanics of automobiles is a better driver or, for a further example,

that someone who knows about the makes of rifles is a better shot. It is quite possible to imagine a situation where a knowledgeable auto mechanic has a poor driving record or a situation where a gun collector has never had occasion to fire any of his weapons.

It is clear that the job analysts did not consider certain important matters such as these but proceeded on the assumption that knowledge of certain matters translates into capable performance of necessary skills, behaviors or tasks. The assumptions of the job analysts cannot serve to validate these examinations which disparately impacted plaintiffs' class.

 The Court, having carefully reviewed the exams themselves, the job analysis and the validation studies, finds itself in agreement with Dr. Cranny, who testified that these exams were little more than a test of reading comprehension and memory. (Tr. 3/20 at 95–96.) Dr. Kriska conceded that the test constructors believed intuitively that a sergeant who had memorized the rules was better off than one who had to look up the rule, (Tr. 3/15 at 99), and that the examinations in question basically were tests of one's knowledge of procedures, policies, regulations, and laws. (Tr. 3/15 at 98.)

Since this Court, unlike Dr. Schmitt, has concluded that these examinations "on the whole" do not meet professional guidelines for content validity, it necessarily follows that defendants' use of a cut-off pass point and defendants' ranking of candidates was also inappropriate. *Williams v. Vukovich*, 720 F.2d 909, 924 (6th Cir.1983); *Guardians Assoc., supra*, 630 F.2d 79, 100–105, *cert. denied* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). Without deciding the relative merits of using these devices in other contexts or circumstances, the Court concludes that defendants have not justified using those devices in this case.

To summarize, the Court concludes that the 1976, 1978 and 1982 sergeants examination had a disparate impact on black officers and further that those examinations have not been sufficiently shown to be job related.

### C. *Transfers and Assignments*

 In addition to claiming discrimination in promotions, plaintiffs challenge defendants' system of granting transfers and making assignments. The Court begins by noting that the terms "transfer" and "assignment" are not synonymous. A transfer generally refers to a change in personnel placement made pursuant to a request for a change of assignment. An assignment, that is, either an initial assignment or one following a transfer, refers to the job in which one is placed following the completion of the personnel placement procedures. The procedure for obtaining a transfer prior to 1978 was an informal word-of-mouth procedure. In 1978, the Division adopted a system for requesting a transfer or reassignment known as the A–19 system. The system or procedure for requesting and granting transfers will be discussed at length *infra*.

In addition, until 1978 or early 1979, the Division required all officers seeking a transfer from a patrol assignment to another assignment to have a minimum of three years in patrol. This time-in-patrol requirement, like the time-in-grade promotion eligibility requirement previously discussed, had a statistically significant adverse impact on the number of black officers who could be considered for transfer. This three-year in-patrol requirement will be discussed *infra*.

### 1. *Statistics Re: Transfers and Assignments*

As in the area of promotions, the Court begins its analysis of defendants' system of transfers and assignments by reviewing the statistical analyses performed by the various experts.

Initially, plaintiffs' expert, Dr. Villemez, attempted to analyze transfers using the A–19 system or A–19 forms in an effort to determine whether any disparity existed in the treatment of black and white officers. Dr. Villemez attempted to analyze the

transfer approval and denial rates in order to determine whether black applicants were being granted and denied transfers at the same rates as white officers. Dr. Villemez concluded that blacks were being denied transfers at a rate greater than whites and that whites were having their transfers approved at a rate greater than blacks. (*See* Pl.Ex. 29, 30.)

Dr. Villemez's analysis of transfers in this regard had several problems due in part to the fact that officers could make multiple transfer requests. In addition, each request had the potential of being denied more than once. The A–19 form, on which officers made their requests for transfers, contained approximately six spaces where a supervisor could indicate the reasons for an officer being denied his transfer request.

Given these facts, if one racial group were submitting more requests than the other group, the approval or denial rates may not accurately reflect the actual treatment of officers' transfer requests. Similarly, if one group were having its requests denied on multiple occasions, while the other group was not, then the results of Dr. Villemez's transfer analysis in this regard might well be skewed.

In an attempt to avoid these problems, Dr. Villemez analyzed requests *acted upon* and concluded that black officers were having fewer of their requests favorably considered.

There are still difficulties with this analysis, difficulties which the Court believes render this aspect of Dr. Villemez's analysis of transfers potentially suspect and of little probative value.

Statistics relating to requests acted upon are not as relevant to our inquiry as statistics relating to the actual numbers or percentages of whites and blacks who were making requests and having those requests granted or denied, one or more times. There are other serious difficulties with relying on statistics derived from the A–19

transfer request forms. It appears that at various times supervisors were using, or misusing, the forms, as the case may be, in arguably unanticipated ways. For example, at certain times every A–19 form in a subdivision file was marked "not chosen" even when the application form was never considered, (see Tr. 4/10 at 174–75), whereas at other times, only those A–19 forms for officers applying to a specific unit within a subdivision were reviewed, considered and marked with an appropriate disposition.

Given such arguable misuse and some internal misunderstanding of the A–19 system, it follows that the A–19 form data used in an attempt to analyze the transfer system is flawed. The plaintiffs contend that this is a flaw which should fall on the shoulders of the defendants, who established a transfer system and then failed to adequately instruct their employees on the proper use of that system.

The Court is not unsympathetic to, and finds some truth in, plaintiffs' argument. However, given the inaccuracies in and other difficulties with the recorded data concerning transfers, the Court cannot conclude that a statistical analysis based on that data is a reliable indicator of a disparity in treatment.

The fact that the Court cannot rely on Dr. Villemez's analysis of transfer requests, approvals and denials based upon data from the A–19 form does not end our inquiry since the Court finds more than ample evidence, statistical and otherwise, of discrimination in the area of assignments.

With respect to the statistical evidence of discrimination in assignments, Dr. Villemez also performed binomial probability calculations similar to the calculations he performed with respect to promotions.[7] He basically looked at the disparity between blacks and whites in assignments to patrol and non-patrol and in assignments to vari-

---

7. If fewer than 50 persons were involved, Dr. Villemez calculated the exact binomial probability. If greater than 50 persons were involved, an approximation to the binomial probability was arrived at by referring to what is known in statistics parlance as a z table.

ous subdivisions including Special Operations (*i.e.*, traffic, SWAT and helicopter) and Special Forces (*i.e.*, SWAT and helicopter) and the Detective Bureau.

Stated another way, Dr. Villemez calculated the likelihood of the difference between the expected and actual numbers of blacks in any subdivision occurring by chance.

Dr. Villemez's calculations concerning the assignments of black and white officers for the years 1974–1983, including recruits, are contained in plaintiffs' exhibits 31(a)–31(j) up through and including plaintiffs' exhibits 39(a)–39(j). The analyses of the assignments of black and white officers for those same years, excluding recruits, are contained in plaintiffs' exhibits 40(a)–40(j) up through and including plaintiffs' exhibits 48(a)–48(j). In both sets of calculations, those which included and those which excluded recruits, Dr. Villemez concluded that there was a pattern of underassignment of blacks to certain subdivisions and overassignment of blacks to patrol.

After the influx of black officers in 1975–1976, the prior pattern of exclusion continued, albeit in less drastic form. In 1975, except for the burglary squad, there were no black officers in the Detective Bureau. (Pl.Ex. 38–I.) Similarly, there was but one black officer in the Special Operations subdivision. (Pl.Ex. 38–C.) In 1976, there remained a statistically significant underassignment of blacks to Special Operations and the Detective Bureau, if one excludes burglary. Of all the officers assigned to the Detective Bureau in 1976, excluding burglary, none was black. (Pl.Ex. 37–I.) At the same time, there was a marked overconcentration of blacks in Patrol. (*See* Pl.Ex. 37–B.) The same pattern repeats itself in 1977, 1978, and 1979 (*see* Pl.Ex. 34–(a)–36(j) and is evident from data on the racial breakdown of the various bureaus. (Df.Ex.HO, Pl.Ex. 508.)

In 1980, blacks continued to be underrepresented in non-patrol assignments including Special Operations, Helicopter and SWAT, the Detective Bureau (excluding burglary, robbery and homicide), and the

Traffic Bureau. (*See* Pl.Ex. 33(a)–33(j).) In 1980 a black officer received an assignment to SWAT for the first time. (Pl.Ex. 33–E.)

In 1981, there was some improvement in the assignment of blacks in part due to the efforts of Deputy Chief Jackson. Nonetheless, blacks continued to be underrepresented in many of the same areas previously noted. (Pl.Ex. 32(a)–32(j).) With certain improvements, there remains at present a statistically significant underassignment of blacks to non-patrol assignments including almost every bureau and unit in the investigative subdivision. Some of the historical patterns of exclusion remain evident in the racial makeup of the various subdivisions and bureaus.

Dr. Milligan, defendants' statistics expert, disagreed with the conclusions reached by Dr. Villemez concerning the assignments of black and white officers. Dr. Milligan stated that Dr. Villemez's statistics were flawed because he used a one-sample as opposed to a two-sample test.

In order to meet the concerns raised by Dr. Milligan, Dr. Villemez made additional calculations using a two-sample model and found that his basic results remained the same.

Dr. Milligan, in testimony, criticized Dr. Villemez for characterizing his categories of assignments too narrowly. As discussed earlier with respect to the promotion data, in performing his analysis, Dr. Milligan used two-by-five and two-by-six Chi-square tables, grouping together the various subdivisions for purposes of analysis.

The Court believes that Dr. Milligan established his categories of assignments too broadly and as a result a disparity in one bureau or subdivision was offset by an arguable overrepresentation in another bureau or subdivision. Dr. Milligan's analysis had the effect of averaging those areas of great disparity with those areas where there was not so great a disparity. The problem with Dr. Milligan's method of analysis is that it fails to focus in on the

assignment areas that are now and historically have been particularly problematic. Dr. Milligan's categories or classifications of assignments assume that a position in each of the smaller units in a larger subdivision is as desirable, and may be considered the same, as every other position in that subdivision. That is not the case. For example, burglary to many is the least desirable assignment in the Detective Bureau and yet it is the unit to which the greatest number of blacks are assigned. Using Dr. Milligan's analysis, wherein all units in the Detective Bureau are grouped together, one may be justified in concluding that there was no discrimination in assignments, despite this concentration of blacks in one unit of the Detective Bureau.

In sum, the Court believes that there is more than ample statistical evidence to suggest disparate treatment and a pattern or practice of discrimination in assignments, Dr. Milligan's analysis notwithstanding. To the extent that Dr. Milligan's analysis suggests otherwise, *i.e.*, that no discrimination exists in assignments, that analysis is rejected.

The statistical evidence with respect to assignments and transfers was bolstered by evidence of numerous denied requests for reassignment made by individual black officers. *See* for example testimony of Rick Leigh (Tr. 3/12 at 73); Robert Booker (Tr. 3/27 at 158); Ted Biggers (Tr. 3/29 at 126–127); Clyde Haynie (Tr. 3/30 at 139); and Larry Mays (Tr. 4/2 at 163).

While the defendants did present evidence of justification for passing over particular black officers for particular assignments, the Court notes that defendants failed to acknowledge the substantial number of black officers who were deterred from even applying for certain assignments.

There was credible testimony that black officers were being deterred from requesting particular assignments because of the Division's tacit approval of a discriminatory assignment policy. *See also* discussion pp. 74–77, *infra.* For example, a black ser-geant, one of the few black supervisors in the Division of Police, testified that he withdrew his request for a narcotics assignment after he was warned that the Narcotics Bureau lieutenant didn't like black officers. (*See* Tr. 3/28 at 58–59.) Similarly, a black officer, now a lieutenant, was told by a supervisor when he requested an assignment to the Juvenile Bureau that the supervising deputy chief was not taking any more blacks. (Tr. 4/2 at 16–19.) Other members of plaintiffs' class were aware of the racist remarks of the SWAT commander and were deterred from requesting an assignment to SWAT. (Tr. 4/3 at 50, 208–209.)

### 2. *Other Non-Statistical Evidence*

In addition to the foregoing, there is other evidence which strongly supports an inference of a pattern and practice of discrimination in assignments and transfers. The evidence in this case strongly suggests that the Safety Director, the Chief of Police and other supervisory personnel did not actively, and with a proper sense of urgency, seek to remove barriers to equal opportunity for black officers.

Initially, a former Chief of Police testified that in 1972 when he first became Chief of Police, blacks were underrepresented in certain areas of the Division. The plaintiffs have contended throughout the course of this litigation that as late as 1978 the Division of Police, including Chief Burden, Safety Director Chupka and now Chief of Police Dwight Joseph, received regular reports from the Division's EEO officer regarding continued underrepresentation of blacks in certain assignments and overrepresentation in others. (Jt.Ex. 150–155.)

The Court has spent considerable time contemplating the evidentiary value of these EEO reports. The Court believes that to some extent frank and critical self-evaluation may well be discouraged were this Court to allow the information contained in the EEO reports to aid in the

establishment of liability.[8] The Court is therefore hesitant to use the information contained in the EEO reports as substantive evidence of discrimination.

■ The Court does believe, however, that the defendants' patent failure to take reasonable curative action based upon the information contained in those reports is of probative value.[9]

In 1980, Joyce Malinek, then the Division's EEO officer, reported that "representation of blacks in the Detective Bureau is quite inadequate." (Jt.Ex. 151.) Ms. Malinek further reported an overrepresentation of blacks in patrol. Subsequent EEO reports reiterated these concerns. (Jt.Ex. 151–155; Tr. 4/12 at 110–111.) In 1982, EEO Officer Larry Stevens reported a disparity in the representation of blacks in the Traffic Bureau. (Pl.Ex. 419.) No steps were taken to investigate, much less remedy, this perceived problem area.

Finally, in 1983, current EEO Officer Mary Lester prepared an underutilization analysis for the current Chief. (Pl.Ex. 407.) That report, like its predecessors, indicated that many of the troublesome areas of prior years remained problematic and of current concern.

The former Chief testified, in part, as follows:

Q. So you don't know, for example, in 1972, 1973, whether even at that time there was an underrepresentation of blacks in detectives, traffic, et cetera?

A. Considering the number on the Division of Police, no, there would have been underrepresentation someplace, definitely.

. . . . .

Q. Aside from what the court ordered you to do, isn't it a fact that, basically, you only gave the most general instructions to your EEO officers and their superiors?

A. Yes, I think so. I think that's true.

Q. You didn't, for example, give them any specific instructions about how to remedy the specific areas of under-representation that you observed?

A. No specific instructions except to say that I wanted us to continue as people—as vacancies came up, I wanted us to continue to get more blacks

---

8. Some courts have apparently gone so far as to conclude that these EEO plans are privileged because the public policy of encouraging frank self-criticism and evaluation in these plans may well be defeated if these plans were subject to discovery. *See EEOC v. ISC Financial Corp.,* 16 F.E.P. Cases 174 (W.D.Mo.1977); *Stevenson v. General Electric Co.,* 26 Fed.R.Serv.2d 574 (S.D. Ohio 1978).

Allowing the discovery of these plans, or their introduction into evidence for that matter, in no way alters a defendant employer's duty to make and file such reports and to insure the accuracy of the information contained therein. Were this Court to conclude that these plans were privileged or inadmissible based upon defendants' argument that employers would be deterred from providing accurate and truthful information in these reports if such reports were subject to use and discovery at some later date, then the Court would in essence be lending credence to the belief that employers would ignore their statutory duty and be less than candid merely because of the possibility of future litigation, however remote. Creating a privilege in order to encourage employers to do what they are already obliged by law to do would be redundant. The Court therefore is unwilling to cloak these EEO reports in some sort of privilege, which would prevent their discovery and use in EEO litigation.

9. The Court is not unmindful that many of the arguments discussed *supra* may be repeated at this point, that is a defendant may be discouraged from accurately reporting EEO information if he believes that those reports may be used in a notice giving function at a trial at some later date. Nonetheless, the Court believes that probative value of these reports outweighs the potential effect their use may have on deterring employers from reporting employment statistics accurately. While it is true that notice-giving use of these EEO reports may also have the effect of discouraging critical self-evaluation, the risk is more attenuated and the probative value of such reports is great.

The Court notes at this point that there was testimony in this case that the EEO officer was specifically advised or instructed to avoid critical comments in her reports. (Tr. 4/12 at 127–134, 179–182.) The Court states unequivocally that there is no place for that type of advice. The EEO system of self-evaluation can only work, without Court intervention, if employers are looking at their employment system critically and with a view toward insuring equality of opportunity.

and females throughout the Division of Police.

Tr. 4/4, pp. 37–38.

Prior to 1972 there had never been a requirement that new police officers serve in patrol for three years before being given an assignment outside patrol. The Division apparently formally instituted the three years in patrol rule for the first time right around the time or soon after this Court ordered certain goals in hiring. (Tr. 4/4 at 25–27.) While there was testimony suggesting that the three years in patrol rule was in fact an unwritten policy some years before it was formally adopted, those persons responsible for promulgating a written version of this rule were reasonably aware of the effect such a rule would have on the number of rather recently-recruited black officers eligible for non-patrol assignments.

The former Chief stated:

Q. Now, after that decision or order in 1975, you knew there would be, over time, a substantial increase in blacks in the Division?

A. Yes.

Q. At the time that you took over as Chief in 1972, there was no—in connection with the transfer procedures followed by the Division, there was no three-year or five-year requirement for people to have transfers; was there?

A. No.

. . . . .

Q. Didn't you recognize that by imposing a three-year requirement for the first time, that blacks were going to be discriminated against because many of them would be just coming on the Department?

A. At that time, I didn't even consider it, didn't think about it.

Q. Would you agree now that, in fact, such a rule at that time would have a discriminatory impact on blacks?

A. I would agree to that and, in fact, we changed the rule.

Tr. 4/4, pp. 25–27.

In this same regard, the former Safety Director testified:

Q. Well, because of the fact that the City of Columbus for the first time began hiring an increasing number of blacks, and therefore, blacks had less seniority than did whites on the whole, is that correct?

A. That would be correct.

Q. And because of that fact, the three year practice or five year practice had an adverse impact on blacks?

A. I would guess you could characterize it that way.

Q. That blacks would have a more difficult time being transferred out of patrol into other units in the Division of Police?

A. Probably.

Q. Because of the three-year policy?

A. Probably.

Q. And you were aware of that at that time, isn't that correct?

A. That is one of the reasons that I requested that it be changed—not changed—

Tr. 4/11, pp. 47–48.

█ Similar to the time-in-grade eligibility requirements for promotions, this time-in-patrol requirement had an adverse impact on black officers by disqualifying them for reassignment at a statistically higher rate than white officers. (See Pl.Ex. 23.) Dr. Villemez confirmed the adverse impact of this three year rule on black officers. (Pl.Ex. 92; Tr. 3/22 at 115–116.)

Deputy Chief Jackson testified that he believed, and communicated his belief to the Chief, that the time-in-patrol prerequisite to transfer served no legitimate function and had an adverse impact on blacks. (Tr. 3/30 at 46–48, 66–67.) Defendants have failed to present a cogent explanation for this rule's existence. The former Chief further conceded that this rule had an adverse impact on blacks (Tr. 4/4 at 27.) and was somewhat arbitrary:

Q. Now, in fact, you would agree that the three-year requirement was really totally arbitrary; wasn't it?

A. Yes.

Q. No studies—

A. By my—

Q. In your opinion?

A. Yes. My opinion is that some experience is necessary. I can't validate a specific period of time. In that sense, arbitrary.

Tr. 4/4, p. 32.

The time-in-patrol rule was formally rescinded in 1979; however, there is evidence suggesting that this rule remained largely in effect, if not formally, at least informally, until 1982. The former Chief also stated:

Q. Let's put it this way: Can you recall that that three-year rule was not changed until sometime after Deputy Chief Jackson had been put in charge of the investigative subdivision?

A. I just don't remember the date that the rule was changed, and I know why it was changed. I don't remember the date.

Q. Without regard to date, wasn't it Chief Jackson that pressed for the change in that rule?

A. I don't remember it that way, no.

Q. You recall that somebody else was the one that promoted or suggested that change?

A. I remember that, in discussions, that the rule was creating problems because we, in fact, needed to transfer both blacks and females to other job assignments for the better efficiency of the Division of Police, and this occurred, sometimes, short of their acquiring three years. It created problems in other areas of the Division of Police because people would complain about them not having their three years, so, the rule wasn't effectively doing the job that we wanted it to do and we did away with it.

Q. Well, didn't you also feel that the rule wasn't, was not serving a purpose?

A. That's what I just said.

Q. I mean aside from blacks and women, didn't you feel that the rule wasn't really serving a purpose?

A. Yes, sir.

Q. But, in fact, you reinstituted the rule in 1981; didn't you?

A. No.

Q. You don't recall—

A. I don't recall.

Q. —the three-year rule being put into effect?

. . . . .

THE WITNESS: There is a qualifier in here that indicates to me, at least, that that's not a hard standard at all.

Q. Well, at least it has been identified as one of the criteria on which the supervisors should base their judgments; isn't it?

A. It's an item to consider but not a mandatory item.

Tr. 4/4, pp. 28–30.

This opinion should not be read to suggest that this Court is of the opinion that *no period of patrol experience is a necessary prerequisite to a transfer outside of patrol.* However, if such a time period is implemented it must be proximately job related. As mentioned above, defendants have not produced probative evidence indicative of such a relationship.

The Court has also briefly mentioned hereinabove the A–19 system for obtaining a transfer. Additional discussion of the policies and procedures utilized when granting and denying transfers will be helpful to an understanding of the Court's legal conclusions about discrimination in the area of transfers and assignments.

Prior to late 1977–early 1978, no formal system existed for requesting a transfer or assignment change. A number of officers testified and it is undisputed that an informal, word-of-mouth system existed for disclosing the availability of positions. During this time, an officer could request an assignment by contacting the supervisor in the chain of command who was responsible for filling the vacancy or by writing a letter to that supervisor, or some higher

authority, requesting a change in assignment. In some instances a supervisor would pick the officer he wanted for an assignment and then request that officer to file an application.

Under the old transfer system, as well as the current system, there is undisputed evidence that most vacancies are not posted. (Tr. 4/4 at 70; Tr. 4/3 at 144–145.) A number of officers testified that generally they learned that a vacancy had been filled, after the fact, by reading about the reassignment in the daily bulletin.

As noted above, in late 1977, early 1978, the Division adopted the A–19 system. Basically, a police officer who desires a change in assignment fills out a form called an "A–19 Form." Any police officer may have more than one A–19 request for transfer pending at any one time although at various times there have been limits placed on the number of A–19 requests that may be filed.

A supervisor who needs to fill a vacancy is required to examine all pending A–19 requests for that position and may in fact solicit additional A–19 forms. Thereafter, the supervisor, based upon his or her review of the A–19s on file, makes a recommendation as to who among the applicants is best suited to fill the vacant position. If the system works according to plan, then the supervisor would make his or her recommendation based upon the "skills, abilities and work performances" of the various applicants. While the Chief of Police has ultimate authority to transfer and assign officers, the evidence establishes that he gives considerable weight to the recommendations of the supervisors. (Tr. 4/11 at 51; Tr. 4/3 at 131–143, 191.)

There were a number of difficulties with the A–19 system which should be noted herein. First and foremost, the evidence established that the A–19 system implemented in 1977 has been by-passed at times. Supervisors often chose the officer they wanted to fill a position without regard to the A–19 requests or the qualifications of other applicants for that position. The current Chief of Police agreed that

until June of 1980 an assignment could be filled pretty much without regard to the A–19 system. (Tr. 4/3 at 179–181.)

Until 1982, supervisors had far-reaching discretion to decide on the competing applicants' qualifications. (Tr. 4/3 at 182–188.) This element of discretion raises a second problem that existed with respect to the A–19 system. There were no stated objective criteria established for judging the qualifications of the applicants for various vacancies. There were no standards for choosing the person to be transferred, and the decision was often subjective.

A supervisor, reviewing the forms with a view toward filling a vacancy, therefore had little or no official guidance as to what to look for in a candidate or as to how to make a selection from among the candidates. Prior to 1982, there were absolutely no standards for selection other than the rather vague language from the Fraternal Order of Police ("FOP") agreement that stated that selections should be based on "skill, ability and work performance." It is undisputed that prior to 1982 no definition of the terms "skill, ability and work performance" appears in the FOP agreement, or elsewhere for that matter. The FOP agreement further stated that assuming all those things were equal, seniority would be the tie-breaker. (Jt. Ex. 95, 96, 97, 98.) Each supervisor was left to his or her own devices in interpreting the meaning of those terms.

The A–19 system therefore in reality did little to alter the method of selecting officers for assignment. Unfortunately, supervisors with bias or prejudice could use the A–19 system in such a way as to impede qualified black officers' efforts to be assigned to subdivisions, bureaus and units.

In July 1982, further efforts were made to revise the A–19 system. (Jt. Ex. 9; Jt. Ex. 10; Transfer Manuals.) At that time all pending A–19s were purged and an effort was made to provide more specific criteria for selection. While these efforts are laudable, the standards and criteria for selection are still somewhat vague and the

subject of some confusion. Based upon all the evidence concerning the system of assignment and transfers, the Court has little difficulty concluding that that system operated to the serious disadvantage of black officers.

The former Chief testified that he did discuss EEO matters at general staff meetings and that he did generally instruct his staff to make efforts to recruit blacks into bureaus and subdivisions where they were underrepresented. However, the implementation of specific procedures to alleviate the underrepresentation was not forthcoming. No standards were in place for reviewing supervisors' decisions from an EEO standpoint and no methods for achieving equal employment opportunity were articulated. Subordinates were not given instructions or basic directions as to how to meet legal obligations to provide equal opportunity. (Tr. 4/4, pp. 38–39.)

### 3. *Defenses*

Defendants assert that there are legitimate nondiscriminatory explanations for the apparent differences in the treatment of black officers. To summarize, defendants claim: (1) that blacks failed to apply for vacancies; (2) that many black officers were offered choice assignments, but refused; (3) that the defendants made good faith efforts to recruit blacks for the areas in which they were underrepresented; (4) that white officers' requests for transfers were similarly denied; (5) that there were no openings in certain subdivisions and bureaus; (6) that there were no qualified black officers or that the white officers chosen to fill positions were more qualified; and (7) that the defendants were unaware of any problems in the system of assignments because black officers failed to complain. Without precluding the assertion of these defenses at a later date in the case of individual officers' requests for relief, if any, the Court concludes that none of these arguments has merit as a defense to the class claims.

With respect to defendants' alleged attempts to get blacks into subdivisions and bureaus, where they were underrepresented, the Court is persuaded that such efforts were both minimal and untimely. The testimony that individual supervisors made continual efforts to solicit black officers for vacancies in their bureaus is not supported by credible evidence. Moreover, some of the most meaningful efforts, which the Court finds were in fact made, to recruit black officers to areas where they were underrepresented, were made only after the filing of this lawsuit. For example, there was testimony that Sergeant Clary, supervisor of the crime scene search unit, allegedly made attempts to recruit blacks without success. (Tr. 4/17 at 80–84.) There was also testimony from Officer Roadcap concerning unsuccessful attempts to recruit blacks to SWAT.

The defendants' argument that there is no actionable discrimination in the Division because white officers had their requests for transfers similarly denied is unavailing. In a suit by black officers alleging discrimination in assignments and transfers, the fact that white officers were not chosen for arguably choice assignments in bureaus and subdivisions in which whites were already overrepresented is of little consequence.

The Division further attempts to defend its system of transfers and assignments by noting that a number of black officers were offered choice assignments, which they refused, and that that refusal, and not discrimination, accounts for the underrepresentation of blacks in various subdivisions and bureaus. This Court cannot agree.

With respect to a number of choice assignments, it appears that to some extent the same black officers, many of whom already had attractive or choice assignments, were offered those positions. For example, Officer Hall was offered jobs in Sexual Abuse, Homicide and Traffic (Tr. 4/17 at 176); Officer Rippey was offered jobs in Intelligence, Vice, Burglary, Homicide and Internal Affairs (Tr. 3/15 at 36–46); Officer Stewart was offered jobs in Traffic, Detective Bureau, Community Relations, and SWAT (Tr. 4/17 at 106–111);

Officer Turner was offered jobs in Narcotics, Vice, Homicide, Check Squad and "A" Company (Tr. 4/17 at 99).

The Court further believes that over the course of the last decade there have been a substantial number of openings in preferred assignments and that qualified black officers have applied for those openings. The underrepresentation of black officers in certain bureaus and subdivisions simply cannot be attributable to the absence of black applicants or the defendants' lack of knowledge of the problems with the assignment system.

Even if this Court were to assume that black officers did not apply for certain positions or did not complain about their failure to receive an assignment, such phenomena have themselves been shown to have a direct nexus to a discriminatory atmosphere in the Division which deterred such applications or complaints.

A number of incidents placing the Division on notice of discrimination are well documented. For example, during the trial of *Brant v. City of Columbus*, a case involving allegations of gender-based discrimination, there was sworn testimony of racism in the Division placing the Chief and the Safety Director on notice of the problem. After that trial, black officers believed that appropriate steps would be taken to investigate perceived racial problems. Following that trial no such action was taken. In fact some of the officers who, based upon the testimony in the *Brant* trial, allegedly made racist remarks were subsequently promoted. It is not surprising, in light of the foregoing, that there was little encouragement or motivation for black officers to complain about racial matters in the Division.[10]

---

10. The former Chief testified:

Q. Now, isn't it also a fact that, in the midst of these reports and in the midst of dealing with an order by the Federal District Court to hire more blacks, that you became aware, through testimony in the Eula [sic] Brant trial—that's the second discrimination case—that there was, in fact, overt racial hazing or slurs going on?
A. As a result of that trial, I heard that that was some of the testimony, yes.
Q. Now, did you order an investigation of the testimony regarding the racial hazing or slurs that came forth in that trial?
A. No, I did not.
Q. No?
A. No.
Q. Did you call in, did you ask for a transcript of the testimony?
A. No, I didn't.
Q. Did you speak to the commanders of the particular officers who had been accused of that conduct?
A. No. It was my opinion at the time that the best thing that the Division of Police could do was to implement the orders established by the court and go on from there and get the whole thing behind us in a way that was most positive.
Q. But in fact, you specifically promised Judge Duncan you'd do the opposite; didn't you?
A. I don't remember that, no.
Q. You don't recall testifying in that trial that you were unaware of that kind of conduct and that, had you been aware, you would have acted, and that after the trial, you were going to order the transcript and do an investigation?
A. I don't remember that. No, sir.
Q. Let me hand you what's been identified as Plaintiffs' Exhibit 521. Let me draw your attention to these questions and answers from the transcript of that trial.
"Question"—
MR. KELLER: Your Honor, I'm going to object. The transcript speaks for itself.
MR. GITTES: I'm just reading as an impeachment statement, Your Honor.
THE COURT: Overruled.
BY MR. GITTES:
Q. "Chief Burden, last Friday, Mary Jane Graham testified that"—I'm sorry. I'm in the wrong place.
MR. KELLER: What page are you on?
MR. GITTES: This is page 176 and it's the surrebuttal.
BY MR. GITTES:
Q. "Question: Specifically, these hazing incidents involved women and they involved racial as well as sexual type slurs. Were you aware of any of these problems existing in the Division?
"Answer: I was not aware of them. However, with every new class that comes out of the police academy, there is a certain amount of hazing that takes place of the new members.
"Question: What is hazing a sign of, generally?
"Answer: It can be a sign of a couple things. Can be learning to accept new members, new members learning to become acceptable. I am sure there are instances of hazing which are rather more vicious than that. I don't know how to describe it.

In conclusion, the evidence, the facts adduced and reasonable inferences drawn from those facts, establish a pattern and practice of discrimination in transfers and assignments.

### D. *Discipline*

Discipline decisions normally proceed through the chain of command with ultimate authority for administering certain types of discipline being vested in the Safety Director subject to an appeal to the municipal Civil Service Commission. The Safety Director may conduct an investigation on formal charges, and he or she alone may suspend, demote or dismiss an officer for misconduct.

All ranking personnel may impose less severe forms of discipline, subject to the approval of the chain of command. Such discipline may include counseling, a verbal reprimand, a written reprimand, and the filing of formal charges with the Safety Director. Discipline is to be progressive. In other words, lesser forms of discipline are imposed for a first offense; more severe sanctions are imposed for recurrent misconduct. The issuance of and type of discipline imposed is a matter largely left to the discretion of supervisory personnel. As of 1983, for certain problems sergeants are permitted to issue minor reprimands without approval of the chain of command. Often, it is discretionary with the sergeant as to whether, and the circumstances under which, such discipline will be imposed.

Most forms of disciplinary action, with the exception of citations for traffic offenses, are documented on Incident Interview Forms, which as a general rule are maintained in the bureau commander's files for six months.

"Question: All right. With regard to the racial and sexual slurs, what are you, if anything, supposed to do about it?
"Answer: Well, following the conclusion of this trial, I would like to get the transcript of the testimony where those allegations are made so that we can have an investigation into those allegations. Subsequent to that, whatever those investigations disclose, there may have to be more training as a result."

Cadets in the academy and officers in their first year of service are probationary. The discipline of cadets is handled within the chain of command at the academy. The discipline of probationary employees is largely governed by the same standards as the discipline of full-fledged officers.

Certain matters are investigated exclusively by the Internal Affairs Bureau (IAB) which maintains incident record cards which record information about charges against an officer. Such records are purged about every six years. Among the matters handled exclusively by IAB are (1) charges of use of excessive force or use of a firearm; (2) citizens' complaints; and (3) alleged criminal conduct by an officer.

From time to time, when there is a conflict in the facts concerning an incident in which an officer is charged with some misconduct, a polygraph examination will be administered. An officer or supervisor may be ordered to submit to a polygraph at any time.

Generally, after an investigation, discipline problems are resolved when one or more of the · following conclusions is reached concerning the charges: (1) unfounded; (2) founded or sustained; (3) not sustained or inconclusive; (4) exonerated; and (5) withdrawn.

Having briefly reviewed the system of discipline which exists in the Division, the Court now turns to an examination of the pertinent evidence concerning the imposition of discipline.

### 1. *Statistical Evidence*

The statistical evidence is inconclusive with respect to whether there was a disparity in the treatment of black and white officers in the area of discipline. The

Do you recall those questions and answers.
A. Yes, there was a definite inference I would do that.
Q. And, in fact, you didn't?
A. That's right.
(Tr. 4/4, pp. 50–53. See also Tr. 4/4, pp. 54–63.)

Court finds that there are serious difficulties with the underlying data concerning discipline, upon which the statistical analysis was conducted. These difficulties may well have resulted in inaccurate statistical findings.

This Court has already described the manner in which Tim Wagner, plaintiffs' computer consultant, placed information on the computer tapes in order that that information might be sent to Dr. Villemez. See p. 19–21.

At the outset, much of the discipline data was obtained from incident record cards which were admittedly incomplete and inaccurate at times. With respect to this data, Wagner created an incident file which contained codes for the disposition of each of the following incidents: (1) use of force; (2) use of chemical mace; (3) use of firearms; (4) citizen complaint; (5) IAB investigation. (Pl. Ex. 62.) The dispositions were coded per Division policy as unfounded, justified, written reprimand or suspension.

When information about a disposition was unavailable, the code "unknown" was used. The dispositions of a number of incidents were unknown. Moreover, there was overlap among the categories of incidents and the potential disposition with respect to those incidents. Wagner's double-checking of, and attempts to fill in, missing data did little to alleviate the difficulty with overlap. (Tr 3/19 at 16–19.)

Even assuming the data sent to Dr. Villemez for analysis in the area of discipline was accurate, the Court has additional problems agreeing with Dr. Villemez's conclusion that there is a statistically significant difference in the treatment of black and white officers in the area of discipline.

Dr. Villemez again did binomial probability calculations, comparing the discipline imposed on blacks with the discipline imposed on whites for the years 1974–1983. (See Pl. Ex. 17–21; Pl. Ex. 52–61.) Dr. Villemez's calculations disclose no significant statistical disparities in the following: (1) IAB investigations for the years 1974–78 and 1980–1983; (2) formal charges for the years 1974–1977; (3) written reprimands for the years 1974, 1980, 1983; (4) suspensions for the years 1974, 1976–1978 and 1981–1983; and (5) discharges for the years 1974–1976 and 1979–81. (Pl. Ex. 52–61.)

In other years the type of statistical finding varied depending in part upon the type of discipline imposed—*i.e.*, formal charges, suspension, written reprimand. In those years in which there is some indication of a statistically significant difference in treatment in the area of discipline, such a result may be explained in part by virtue of the small sample size. In certain years, although Dr. Villemez found a statistically significant difference in the number of discharges, the sample size was so small that no significance should be attached to the analysis for those years. For example, in 1979 and 1980, according to Dr. Villemez, based upon the rate at which whites were being suspended, one would have expected fewer black suspensions than there actually were. In 1979 based on the number of whites suspended, one would expect 1.13 blacks to have been suspended. In actuality, 5 blacks were suspended. This evidence led Dr. Villemez to conclude that there was a statistically significant difference in treatment in the area of suspensions for those years. Similarly, in 1983, the actual number of black discharges exceeded the expected number of discharges. One would have expected .44 (or zero) black officers to be discharged, while in fact there were only two black officers discharged. This sample size is so small that there is no statistical significance to Villemez's analysis.

In addition, if one were to conclude, in any of the years where there is statistical evidence of disparity in discipline, that the discipline imposed, in the form of discharge or suspension, was warranted, then plaintiffs would have failed to meet their burden of proof. The Court will address the issue of whether discipline imposed upon black officers by the Division was warranted in pages which follow. The Court does not believe that the statistical evidence of a disparity in imposing discipline is persuasive.

The Court adds that it finds no evidence of disparate treatment in the discipline of probationary employees. (*See* Df. Ex. M–W, M–Y, M–X, M–Z.)

### 2. *Non-Statistical Evidence*

Assuming this Court were to find some validity with respect to the plaintiffs' statistical analysis of incidents of discipline, the Court believes that defendants have presented substantial evidence of a legitimate business justification for the discipline imposed. There is no probative evidence of pretext concerning the evidence of justification.

Without attempting to be exhaustive, several pertinent examples will suffice to illustrate the justification offered for defendants' discipline decisions.

In 1984, a black officer was discharged for falsifying an affidavit in support of a search warrant. This Court has little or no difficulty concluding that the imposition of that form of discipline was perfectly warranted under the circumstances, despite the officer's protestations that his partner, a senior officer, instructed him to make the false statements.

Similarly there was substantial testimony during the course of this trial about Officer Stubblefield. While the Court does find evidence of racial animus directed toward Officer Stubblefield, which will be discussed hereinafter, the Court also has little difficulty concluding that the defendants were warranted in disciplining Officer Stubblefield for assaulting a female employee, (Pl.Ex. 356, p. 1) and for verbally threatening another employee. (Pl.Ex. 356 at p. 2.)

Plaintiffs contend that it is not the individual instances of discipline which are discriminatory, but rather, the lack of comparable or uniform discipline for white and black officers.

In this vein, the Court believes that the defendants established a lack of comparability of the incidents in which plaintiffs alleged that black and white officers were treated dissimilarly.

While plaintiffs made some effort to compare similar instances in which they find evidence that black and white officers were disciplined differently, the defendants correctly observe that it is virtually impossible to find two truly comparable situations. Comparing the situation where a white officer was not discharged even though he failed a polygraph with a situation where a black officer was discharged for submitting a false affidavit with a warrant application is a little like comparing apples and oranges. The two situations are not comparable. The Court finds that there were very few, if any, truly comparable discipline situations which evidence a disparity in the treatment of black and white officers.

Even in somewhat comparable situations, where, for example, officers were charged with misconduct for fraternizing with members of the opposite sex, the Court further finds there is a dearth of evidence to indicate that the type of discipline imposed on either or both officers was unwarranted, unjustified, or so disproportionate as to give rise to an inference of discrimination.

Plaintiffs also wage a broad-scale attack on the system of discipline because of its discretionary and subjective nature. Plaintiffs specifically claim that there are no documents describing what penalties are to be imposed and for what offenses. In sum, plaintiffs urge that there is a potential for inconsistent application. This potential is not sufficient to establish liability for discrimination in the area of discipline, absent some additional, solid evidence that this system is being applied in an arbitrary and discriminatory manner.

At this point, the Court hastens to add that the Division might nonetheless be well advised to review its system of disciplining officers in an effort to decrease those subjective aspects of that system and to clarify to some degree the standards to be employed by those imposing discipline.

In concluding this discussion, the Court notes that to a large extent in the area of discipline it is necessary to defer to

the experienced and hopefully unbiased decisionmakers in the Division of Police. Decisions about what discipline, if any, is to be imposed in certain, often unique, situations is always somewhat subjective. Many of life's decisions are subjective, and therefore, have the potential to be applied in an arbitrary or discriminatory manner. But absent some concrete evidence that there is a pattern of imposing discipline more often and more severely on black officers, the Court is unwilling and unable to make a finding of discrimination in this area.

### 3. *Retaliation*

With respect to the discipline of black officers, plaintiffs further allege that members of POER and the plaintiff class have been retaliated against and unjustifiably disciplined for filing this lawsuit. As has already been noted, there is insufficient evidence of a pattern and practice of discriminatory imposition of discipline. Specifically, the Court finds insufficient evidence to warrant a conclusion that there was a pattern and practice of unlawful discipline directed against plaintiffs in retaliation for bringing this lawsuit.

### E. *Other Terms and Conditions of Employment*

There are a number of claimed injustices in the Division's work environment which do not fall within one of the areas of alleged discrimination previously discussed. Plaintiffs claim that black officers are not treated as favorably as white officers in shift assignments and days off. Plaintiffs' statistics expert, Dr. Villemez, analyzed the data for the years 1974–1983 with respect to days off and shift assignments, excluding recruits in one instance and including them in the other. (Pl.Ex. 40(K), 48(L) and 470, 471.)

Dr. Villemez concluded that in 1974 and 1975 there was no statistically significant difference in the treatment of black and white officers in shift assignments and days off.

In 1976 and 1977 the number of standard deviations begins to rise and by 1978 there is a statistically significant disparity in the treatment of black and white officers in favorable days off and shift assignments. The defendants argue that days off and shift assignments are made on the basis of hire date and that they have always been made on that basis. Defendants' expert, Dr. Milligan, stated that there are in essence more blacks than one would expect with favorable days off and shift assignments if in fact one controls for hire date. This is what Dr. Milligan refers to as Simpson's Paradox, which simply means that an independent variable such as hire date explains the apparent disparity in treatment. (Df.Ex. H–M, pp. 41–85B; Tr. 4/9 at 110–115).[11] Defendants argue that any perceived disparity in the shift assignments and days off of black and white officers may be traced to the fact that many black officers have more recent hire dates.

■ On pages 24–27, 40–41, 50, and 60–64 in this opinion the Court has rejected defense contentions that certain time-in-grade requirements for sitting for the sergeants examination and for assignment to non-patrol functions were proper as job-related or otherwise immunized from a finding of illegality on the basis that they were *bona fide* seniority matters pursuant to the *Teamsters v. United States, supra,* rationale. However, with respect to the relationship between seniority and days off and shift assignment, the Court believes the selection procedure is lawful despite its disparate impact on plaintiffs.

Although there is no written policy or agreement, it is undisputed that the selection of persons for favorable shift assignments and days off always has been made

**11.** Dr. Milligan also noted that Simpson's Paradox or the independent hire date variable, explains the apparent disparity in transfers and assignments. In those contexts Dr. Milligan's arguments have little merit partly because of evidence of prior pattern and practice of discrimination in transfer and assignments and partly because of the absence of pervasive evidence indicating that hire date was historically a factor relevant in assignment decisions.

according to seniority. This procedure existed pre-Act, and there is not a hint in the evidence that it was established to discriminate against blacks.

Therefore, the Court is unwilling and unable to find unlawful the procedure of assignments of days off and to shifts on a basis of seniority.

■ Plaintiffs introduced evidence in an attempt to prove that the defendants' no beard policy disparately impacted blacks. Plaintiffs claim that certain black officers suffer from a condition known as psuedo folliculitis barbae (PFB) which requires such persons to refrain from shaving their facial hair. Therefore, plaintiffs argue, the defendants' no beard policy discriminates against them. The Court finds no merit to this argument.

The Division undertook an investigation of this problem as soon as it was brought to its attention and the regulations concerning beards were redrafted so as to allow officers suffering from PFB to wear beards. (Df.Ex. GX–HC.) Class member and EEO coordinator, Officer Larry Stevens, was instrumental in researching this matter and promulgating a new Division policy.

In sum, the Court believes that the defendants, by revising their grooming standards, made adequate efforts to accommodate black officers suffering from PFB.

Lastly, plaintiffs allege that they were subjected to, and forced to work in, a racially charged and hostile work environment. The Court has already reviewed in part some of the unpleasant and unacceptable discriminatory conduct of some members of the Division of Police, many of whom were supervisors, which serve as examples of racist remarks and racial slurs.

As has already been noted, plaintiffs spent substantial amounts of time in this case discussing Officer Ollie Stubblefield and the problems he experienced while on the police force. Officer Stubblefield received racist mailings and was referred to in a discriminatory and derogatory manner by a number of white officers. The Court finds it unnecessary to make any further finding concerning instances of racial animus than those already discussed.

■ Given the evidence discussed in this opinion which will not be repeated here, it is clear to the Court that many black officers were the victims of racial slurs and other racially-oriented harassment. This is not to say that the entire Division was permeated with racial hostility or that a majority of white officers treated black officers with a manifest negative racial attitude. However, the evidence does indicate that a significant number of members of plaintiffs' class were subjected to such unfortunate treatment to support the conclusion that they were the victims of a pattern and practice of discrimination. The Division's leadership was put on notice of the existence of the problem, but they failed to investigate or to otherwise make reasonable efforts to ensure a racially neutral work environment for all officers.

## V. Conclusions of Law

Based upon the foregoing, plaintiffs allege violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[12]

Before turning to an analysis of the substance of these claims, the Court notes that plaintiffs have complied with the jurisdictional prerequisites for filing suit under

---

**12.** Plaintiffs have voluntarily dismissed their claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1981, as well as their various constitutional claims. Individual claims for compensatory or punitive damages are not at issue in this case, and the Court's discussion is limited to class claims under Title VI and Title VII. Moreover, the relief, in the form of back pay or otherwise to which any individual may be entitled, if any, is a matter which is left to the remedial phase of this litigation. See EEOC v. H.S. Camp & Sons, Inc., 542 F.Supp. 411 (M.D.Fla.1982). The Court's conclusion in this regard is consistent with recent pronouncements of the Supreme Court in class action employment discrimination matters. Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 2576, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).

Title VII, 42 U.S.C. § 2000e. The Court concludes that the violations of Title VII in this case constitute continuing violations having been committed over a period of years and representing a policy and practice of discrimination in the Columbus Division of Police.

 In this latter regard, the Court finds that plaintiffs have presented evidence that defendants engaged in a continuous pattern of discrimination against blacks in promotions and assignments and transfers from late 1977 to present. Such practices were perpetrated within the requisite time period prior to filing charges with the EEOC. *See Association Against Discrimination v. City of Bridgeport*, 647 F.2d 256 (2d Cir.1981). Given the continuous nature of the violations in this case, the Court concludes that plaintiffs are entitled to prove the existence of discriminatory acts or practices occurring both before the filing of the EEOC charge and before the beginning of the statutory time period prior to the filing of the EEO charge. *See Held v. Gulf Oil Co.*, 684 F.2d 427, 430 (6th Cir.1982); *Guardians Association v. Civil Service Comm'n.*, 633 F.2d 232, 249 (2d Cir.1980); *Patterson v. American Tobacco Co.*, 586 F.2d 300, 304 (4th Cir.1978).

In a somewhat similar vein this Court notes that even evidence of pre-Act discrimination is not without some probative force since it creates an inference, however slight, that the discrimination continued. *See Donnell v. G.M. Corp.*, 576 F.2d 1293, 1298 (8th Cir.1978).

### A. Liability under Title VII

 There are two theories available to a plaintiff under current law to prove a case of unlawful discrimination under Title VII: disparate impact and disparate treatment. See *Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In a case that proceeds on a theory of disparate treatment, a plaintiff seeks to prove that an employer intentionally treats some people less favorably than others because of their race. Proof of discriminatory motive is

critical in this case; however, especially in cases alleging class-wide discrimination, illicit motive may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparably situated members of the majority group and from other surrounding circumstances. Cases involving such class-wide allegations of discrimination are often referred to as "pattern and practice" cases. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977); *Rowe v. Cleveland Pneumatic Co., Numerical Control*, 690 F.2d 88, 92 (6th Cir.1982).

 Disparate impact cases, on the other hand, generally involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive is not required under this theory. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

 Either or both theories may be applied to a particular set of facts; each theory represents in essence an alternative basis upon which liability may be premised. *Teamsters v. United States, supra*, 431 U.S. at 335, 97 S.Ct. at 1854. In point of fact a "pattern or practice" of disparate treatment challenge to an employment system as a whole often implicates disparate impact analysis. Such is the case herein. So as to avoid any confusion as to the basis for its holding, the Court feels compelled to evaluate the present claims under both theories as described below.

### 1. Disparate Impact

Under a disparate impact theory, plaintiffs must produce evidence which demonstrates that the employment practice, while neutral on its face, operates to significantly disadvantage black employees. In its most

recent articulation of what is required in Title VII disparate impact cases, the Supreme Court has noted that

> *Griggs* and its progeny have established a three-part analysis of disparate impact claims. To establish a prima facie case of discrimination, the plaintiff must show that factually neutral employment practices had a significantly discriminatory impact. If that showing is made, the employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination. *Griggs, supra,* at 432, 91 S.Ct. at 854. Even in such a case, however, the plaintiff may prevail if he shows that an employer was using the practice as a mere pretext for discrimination. See, *Albemarle Paper Company, supra,* 422 U.S. at 425, 95 S.Ct. at 2375; *Dothard, supra,* 433 U.S., at 329, 97 S.Ct. at 2726–2727.

*Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2532, 73 L.Ed.2d 130 (1982).

Turning then to the application of these legal principles to the instant case, if plaintiffs have been able to show that certain of defendants' employment practices disparately impact blacks, then defendants must show that such requirements or practices are a business necessity which bears a demonstrable relationship to successful job performance. If the defendant employer demonstrates that the practice is "job related," then the plaintiffs must be permitted to prove that another less drastic practice would serve the employer's business needs just as well but without the undesirable racial impact. Such proof is evidence that the employment practice is being used merely as a pretext for discrimination. *Albemarle Paper Co. v. Moody,* 422 U.S. 405,

425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Rowe, supra,* 690 F.2d at 94.

In this case, the Court concludes that plaintiffs have proved that the procedures employed by defendants in promoting, assigning and transferring police officers, while arguably neutral on their face, had an adverse impact on blacks. *United States v. Chicago,* 573 F.2d 416, 421 (7th Cir.1978). These practices or procedures include the promotional exams for the years 1976, 1978, and 1982; the five-year and later three-year time-in-service eligibility requirements for promotion; the three year time-in-patrol requirement for transfers or reassignment; and the subjective A–19 system for transfers.

As a threshold matter, plaintiffs produced sufficient evidence to demonstrate a *prima facie* case in order to require the defendants to demonstrate that the employment practice or practices which produced such an impact is job related. Often such a case is established by use of statistics demonstrating a disparity in the rates of selection for black and white employees. *Teamsters, supra,* 431 U.S. at 339–40, 97 S.Ct. at 1856–57. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 582–87, 99 S.Ct. 1355, 1364–67, 59 L.Ed.2d 587 (1979).

In this case, the Court has already engaged in a somewhat lengthy discussion of the statistical evidence produced by both parties during this lengthy trial. On this record, the Court concludes that various challenged employment practices of the defendants resulted in the selection of employees in a racial pattern which suggests a significantly lower selection rate for black applicants than one would expect. The evidence indicates a statistically significant underrepresentation of black officers in various positions in the Division of Police.[13]

---

**13.** Defendants argue that the statistical disparity in this case was not so great as to amount to a *prima facie* showing of discrimination. See *Hazelwood School District v. United States,* 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977); *Teamsters, supra,* 431 U.S. at 336, 97 S.Ct. at 1854. This Court does not agree. A *prima facie* case may be established by use of any of a number of reasonable statistical mea-

sures, including the 80% rule of the EEOC and Uniform Guidelines or the standard deviation measure of *Castaneda,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). See *Guardians Association v. Civil Service Commission,* 630 F.2d 79 (2d Cir.1980).

Even assuming defendants are correct concerning the magnitude or level of statistical disparity needed to prove a *prima facie* case, other

The Court, in part, reaches its conclusions regarding the time eligibility requirement and the examinations based upon plaintiffs having demonstrated a vviolation of the 80% rule. *See Williams v. Vukovich*, 720 F.2d 909, 926 (6th Cir.1983); *Guardians Association v. Civil Service Commission*, 630 F.2d 79, 88 (2d Cir.1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Bushey v. New York State Civil Service Commission*, 571 F.Supp. 1562, 1565 n. 7 (S.D.N.Y.1983).

In addition to proving a violation of the 80% rule, plaintiffs produced further statistical evidence which demonstrated the adverse impact of these promotion selection procedures on blacks. Specifically, Dr. Cranny testified that the difference in the mean scores and the passing rates of black and white officers, at least with respect to the sergeant's examinations for the years 1976 and 1978, were statistically significant to the .05 level. The adverse impact of these exams was apparent whether one used a one-tail or two-tail test. There was a statistically significant difference in the mean scores of black and white officers in the 1982 sergeant's exam so that it is possible to conclude that on the whole black officers did not perform as well as white officers on that exam. The 80% rule was also violated with respect to the 1982 exam although there was no demonstrably statistically significant difference in passing rates.

Dr. Cranny also concluded that the time-in-service eligibility requirement had an adverse impact on blacks. This finding was concurred in by Dr. Villemez, who performed an independent statistical analysis of this requirement. (*See* Pl.Ex. 28 and 27.) The Court is persuaded by this evidence and the findings set forth in greater detail in Part IV, B of this decision.

The plaintiffs have established a *prima facie* case of discrimination with respect to these promotion-related employment practices. Before moving on to consider the other alleged discriminatory employment practices, the Court believes it appropriate to pause at this point to analyze whether defendants have demonstrated the business necessity for or job relatedness of these examinations and time-in-service eligibility requirements.

It will be recalled, no doubt, that discriminatory tests and devices are impermissible unless shown, by professionally accepted methods, to be "predictive of or significantly correlated with important elements of work behavior which comprise or are related to the job or jobs for which candidates are being evaluated." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975).

Stated another way, the employer must meet the burden of showing that "any given requirement ... [has] a manifest relationship to the employment in question." *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977). *See also Craig v. City of Los Angeles*, 626 F.2d 659 (9th Cir.1980); *United States v. City of Chicago*, 573 F.2d 416, 425 (7th Cir.1978).

The defendants contend that both these practices or selection devices are job related. No real attempt was made to show a business necessity for these selection devices except insofar as that term encompasses the need for successful job performance. Successful job performance includes anything which increases the safe and efficient operation of a business.

A selection procedure which is job related is one which is a reasonably reliable predictor of job performance. There was much discussion throughout the course of trial, and indeed in various parts of this opinion, about the job analyses and test validation techniques. For the reasons set forth in Part IV, B–2 of this opinion, the Court believes that defendants failed to

evidence submitted in this case, and discussed later in this opinion, tends to support the inference of disparate impact suggested by plaintiffs' statistical data. *See EEOC v. E.I. duPont de Nemours & Co.*, 445 F.Supp. 223 (D.Del.1978). The Court finds no merit to defendants' arguments concerning the absence of a *prima facie* case.

show that these sergeants promotional examinations were job related.

It should be recalled that the sergeants examinations in question failed to meet test validity standards in several respects. First, as previously detailed, the job analysts and test constructors failed to adhere to the APA standards and the administrative agency guidelines concerning testing, job and validation strategies. To the extent that these standards and guidelines reflect expert but non-judicial opinion, they are viewed with the same combination of deference and hesitation that characterizes careful judicial analysis of expert opinion generally.

In this case the guidelines provide a useful indication of the standards used by federal agencies such as the EEOC in enforcing Title VII and constitute an authoritative administrative interpretation of that Act. *See Guardians Association v. Civil Service Commission,* 630 F.2d at 93–94; *Bridgeport Guardians v. Bridgeport Police Department,* 431 F.Supp. 931 (D.Conn. 1977). The Court concludes that defendants' failure to abide by the guidelines in question, in the ways previously described, is an additional factor bolstering the conclusion that the defendants failed to prove that the examinations are job related.

The Court finds that the central requirement of Title VII's job relatedness concept has not been satisfied by defendants' examinations. Critical to a finding of job relatedness is proof of a manifest relationship of test content to job content. In this regard,

> An employer cannot justify an employment test on the grounds of content validity if he cannot demonstrate that the content universe includes all, or nearly all, important parts of the job.

*United States v. City of Chicago,* 573 F.2d 416, 425 (7th Cir.1978) (quoting the APA standards). *See also, Firefighters Institute for Racial Equality v. United States,* 549 F.2d 506 (8th Cir.1977). As previously detailed, these sergeants examinations failed to test for behaviors that were both necessary for and critical to performing the job of sergeant. The Court continues to believe that Dr. Cranny correctly assessed these examinations as being little more than tests of memory and reading comprehension.

Despite the serious and fatal flaws in the process of constructing these exams, it is clear that with some recognition of the standards established by the courts in the Title VII area, an energetic and good faith attempt was made to develop a test which complied with the law. However, defendants' good faith but unsuccessful attempt to develop a sergeants examination is not determinative of that examination's content validity. The Court concludes that the 1976, 1978, and 1982 sergeants promotional examinations amounted to unlawful barriers to equal employment opportunity for black officers.

The Court next turns to an analysis of the time eligibility requirements with a view towards determining whether those requirements manifest any relationship at all to job performance. No real attempt was made to validate either the time-in-service eligibility requirement for taking the promotional exam or the time-in-patrol prerequisite for transfer. The testimony established that while the Division was in fact aware of the potential, if not actual, adverse impact of these rules, apparently no attempt was made to discover and articulate a specific job-related basis for the continued adherence to these time requirements.

The Court is persuaded that there are ways in which these time requirements may be validated. As Dr. Cranny testified, what one tries to do is to show that persons meeting this requirement are better able to perform the job than those persons not meeting the requirement. (Tr. 4/20 at 93–96.) No attempt was made to do this nor was an explanation proffered for the failure to engage in this type of analysis. *See Afro-American Patrolmen's League v. Duck,* 503 F.2d 294, 302 (6th Cir.1974); *Chrisner v. Complete Auto Transit,* 645 F.2d 1251, 1257 (6th Cir.1981).

In sum, this Court believes that the time requirements in effect in the areas of both promotions and reassignment had an adverse impact and have not been shown to be job related.

Despite the absence of any nexus between these time requirements and the jobs in question, defendants contend that these time eligibility rules are insulated from attack because they constitute a *bona fide* seniority system. This Court has already had occasion to address this contention.

Without reiterating those matters previously discussed, the Court notes that § 703(h) protects seniority systems that are *bona fide* and that perpetuate the effects of pre-Act discrimination. *Teamsters, supra,* 431 U.S. at 343–356, 97 S.Ct. at 1858–1865; *Franks v. Bowman,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Section 703(h) does not protect seniority systems that are not *bona fide* or that perpetuate the effects of post-Act discrimination. *See also Firefighters, Inc. for Racial Equality v. Bach,* 522 F.Supp. 1120 (D.Colo.1981); *Pullman-Standard v. Swint,* 456 U.S. 273, 277, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982).

For the reasons set forth in part B of this opinion the Court does not believe that these time eligibility requirements constitute a *bona fide* seniority system within the meaning of § 703(h). Second, these time requirements were adopted post-Act and do not therefore merely have the effect of perpetuating past discrimination.[14]

### 2. *Disparate Treatment*

Much of the same evidence and many of the same arguments may be marshaled in support of plaintiffs' contention that defendants engaged in a pattern and practice of discrimination.

In class action pattern and practice employment discrimination suits plaintiffs bear the burden of establishing a *prima facie* case that defendants' customary practice was to discriminate against a protected class. *Hazelwood School District, supra,* 433 U.S. at 307–308, 97 S.Ct. at 2741–2742; *Payne v. Travenol Labs, Inc.,* 673 F.2d 798, 816 (5th Cir.1982). In such cases, the Court is ultimately concerned with whether, and it is the plaintiffs' ultimate burden to prove that, an employer has intentionally treated one group of persons less favorably than another. *Teamsters, supra,* 431 U.S. at 336, 97 S.Ct. at 1854.

In such cases the evidence adduced to establish a *prima facie* case may also bear on the ultimate issue of whether the employer has intentionally discriminated against members of plaintiffs' class. As has already been noted, under a disparate treatment classwide claim, statistical proof or proof of a disproportionate impact is circumstantial evidence supporting an inference of intentional discrimination. A less pronounced statistical disparity may suffice to establish a *prima facie* case if buttressed by other evidence. Ultimately the inference of intentional discrimination may be drawn from the same statistical evidence bolstered by additional non-statistical evidence. Such evidence supporting the inference of intentional discrimination may include testimony revealing a history of discrimination or discriminatory employment practices, individual instances of discrimination [15] and opportunities to discrimi-

---

**14.** Several courts have suggested that the 703(h) *bona fide* seniority system defense is an affirmative defense which must be pleaded and proved by defendants. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *Jackson v. Seaboard Coast Line R. Col,* 678 F.2d 992 (11th Cir.1982); *Thompson v. Sawyer,* 678 F.2d 257, 285 (D.C.Cir.1982). If that were the case, defendants have failed to properly plead and most certainly prove that defense. Even assuming otherwise, the Court believes for many of the reasons stated herein that these

time requirements are not entitled to protection as a *Teamster bona fide* seniority system.

**15.** Certain individual instances of discrimination have been referred to at various points in this opinion. No attempt will be made to address every alleged individual case of discrimination nor will the evidence previously discussed be reiterated herein. The focus of the Court's inquiry at the liability stage of a pattern and practice trial should be in the pattern of discriminatory decisionmaking and not on individual employment decisions. *EEOC v. H.S.*

nate inherent in the employer's decision-making process. *See Payne, supra,* 673 F.2d at 817; *United States v. City of Buffalo,* 457 F.Supp. 612 (S.D.N.Y.1978).

The evidence of defendant Division's employment practices prior to the effective date of Title VII is set forth in substantial detail in Part III, B of this opinion. The longstanding pattern of discrimination in the Division dating back to the 1940's and '50's and continuing until present is well documented. That evidence will not be reviewed again here.

The proof in this case is not limited, however, to evidence of the employer's pre-Act discriminatory practices. For example, there was evidence that the time eligibility requirement for transfers was not formally adopted until sometime after this Court ordered remedial action in hiring in 1975. The adoption of such a time requirement, even though the defendants were aware that such a requirement would have an adverse impact on blacks, may also give rise to an inference of intentional discrimination. Similarly, defendants' knowledge of and refusal to act upon evidence which indicated an underrepresentation of blacks in certain assignments in the Division also supports an inference of intentional discrimination.

In light of the foregoing, the plaintiffs' evidence concerning the subjective and *ad hoc* nature of employment advancement decisions in the Division is particularly powerful. Procedures that leave room for the exercise of subjective judgment in the evaluation of candidates for positions are carefully scrutinized in the law. *Brooks v. Ashtabula County Welfare Department,* 717 F.2d 263, 267 (6th Cir.1983); *Abrams v. Johnson,* 534 F.2d 1226 (6th Cir.1976). As one court has noted,

> Greater possibilities for abuse ... are inherent in the subjective definitions of employment selection and promotion criteria. Yet they are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions

*Camp & Sons, Inc.,* 542 F.Supp. 411 (M.D.Fla.

about hiring and promotion in supervisory and managerial jobs cannot realistically be made using objective standards alone. Thus it is especially important for courts to be sensitive to possible bias in the hiring and promotion process arising from such subjective definitions of employment criteria.

*Rogers v. International Paper Co.,* 510 F.2d 1340 (8th Cir.1975), *vacated on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *reinstated with modification on other grounds,* 526 F.2d 722 (8th Cir.1975). An employee selection procedure which is largely subjective must be closely scrutinized because of its capacity for unlawful bias. *Swint v. Pullman Standard,* 539 F.2d 77, 105 n. 72 (5th Cir. 1976), *rev'd. on other grounds,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (subjective criteria ready mechanisms for discrimination); *Senter v. General Motors,* 532 F.2d 511, 529 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976) (subjective procedure tends to favor incumbents at minority expense. *Accord Davis v. Califano,* 613 F.2d 957, 965 (D.C. Cir.1979); *Muller v. United States Steel Corp.,* 509 F.2d 923 (10th Cir.1975).

Without attempting to review all the evidence concerning defendants' system of making assignments, the Court believes that that system, which leaves substantial room for the exercise of subjective judgment, operates to the disadvantage of black officers. Specifically, notices of openings or of availability of positions are not posted and the records kept concerning requests for assignment were incomplete and sometimes misused. *See EEOC v. E.I. duPont de Nemours & Co.,* 445 F.Supp. 223 (D.Del. 1978). Employees are not notified of the opportunities or qualifications necessary for job change or advancement. *See Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir.1972). Supervisors' recommendations which may well be based on subjective judgments are considered important, if not indispensable, in making assignments and yet those supervisors are given no stan-

1982).

dards upon which to base their recommendations other than the rather vague and subjective criteria found in the FOP agreement. Finally, there are no safeguards to avert discriminatory supervisory evaluations. *See Senter v. General Motors Corp.*, 532 F.2d 511, 528–529 (6th Cir.1976); *Royal v. Missouri Highway Transportation Commission*, 655 F.2d 159 (8th Cir. 1981).

This Court finds that the facts of this case warrant reaching the same conclusions as were reached by another court faced with a similar set of circumstances, that is

> The method of assignment is essentially a discretionary decision of supervisory personnel, ... [who] are white, and that discretion has been shown, as here to have operated to virtually entirely exclude minority employees from certain jobs, the logical inference is that the employer intended to discriminate.

*Bridgeport Guardians v. Delmonte*, 553 F.Supp. 601, 609 (D.Conn.1982). *Accord James v. Stockham Valves & Fitting Co.*, 559 F.2d 310 (5th Cir.1977).

 In sum, the subjective system of assignments, coupled with other evidence including a proven statistical disparity in the treatment of black and white officers in the area of assignments leads this Court to conclude that plaintiffs have established a pattern and practice of intentional discrimination in transfers and assignments.

The same conclusions cannot be reached, however, with respect to plaintiffs' allegations of a pattern and practice of discriminatory discipline. While the Court acknowledges that the system of imposing discipline is also somewhat subjective and therefore susceptible to discriminatory abuse, the other evidence with respect to the imposition of discipline simply falls short of the quantum of proof necessary to prove a pattern and practice of discrimination.

There are problems with the underlying data upon which the plaintiffs' expert based his conclusion of statistical disparity. The incident record cards used to categor-

ize the types of discipline were incomplete and sometimes inaccurate. This Court has no way of knowing if other records had been purged. Further, Tim Wagner's coding system allowed for overlap of dispositions and incidents and created substantial uncertainty about the data sent to Dr. Villemez for purposes of calculating statistical significance. Basically, Wagner's coding system had many of the same risks and uncertanties that this Court found in Dr. Milligan's violation of the assumption of independence in the promotions area. Also, with respect to imposition of certain kinds of discipline, the sample size is so small that any opinion of statistical significance, which was rendered based upon a perceived or apparent disparity in the expected as opposed to actual numbers disciplined, is suspect. There is a much greater uncertainty and likelihood of miscalculation in the area of discipline than in the areas of promotions, and transfers and assignments. The Court finds that risk unacceptable.

Based upon the foregoing, and the additional matters set forth in Part IV, D of this opinion, the Court concludes that in the area of discipline the evidence is inconsistent and insufficient to establish a *prima facie* case of a pattern and practice of discriminatory treatment. Even assuming there was sufficient evidence to make out a *prima facie* case, plaintiffs have nonetheless failed to sustain their ultimate burden of proving intentional discrimination in the area of discipline.

In addition to prohibiting discrimination in promotions and assignments, Title VII prohibits terms and conditions that discriminate against one racial group. *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir. 1982); *Garcia v. Gloor*, 618 F.2d 264, 270 (5th Cir.1980); *Firefighters Institute for Racial Equality v. St. Louis*, 588 F.2d 235 (8th Cir.1978). Terms and conditions of employment include "the state of psychological well-being at the workplace." *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir.1982); *Bridgeport Guardians v. Delmonte*, 553 F.Supp. 601, 615 (D.Conn.

1982); *Compston v. Borden,* 424 F.Supp. 157, 161 (S.D.Ohio 1976).

The Court finds that there was a pattern of racially insulting and humiliating behavior in the Division of Police which was condoned on occasion by supervisory personnel. The Court further believes that black officers have been subject to unwelcome and unsolicited harassment which is both offensive and undesirable. In conclusion, the facts of this case support a finding of discriminatory work environment. Plaintiffs' remaining allegations concerning the terms and conditions of their employment are not well taken for all of the reasons set forth in Part IV, E of this opinion.

### B. *Liability Under Title VI*

In addition to alleged violations of Title VII, plaintiffs claim that defendants' conduct amounts to a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*

Title VI of the Civil Rights Act provides in pertinent part that

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

■ Initially, despite defendants' representations to the contrary, the Court finds that defendants City of Columbus and the Columbus Division of Police are the recipients of Federal financial assistance. (Tr. 4/11 at 166–169.) Thus, the Court believes that plaintiffs have satisfied that condition precedent to obtaining the protection afforded by Title VI.

Thereafter, the Court's task becomes a bit more difficult. The Court first notes that there is some disagreement over whether a private right of action even exists under Title VI. This Court concludes, and is not alone in doing so, that a private right of action exists under Title VI. See *Guardians Association v. Civil Service Commission,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *see also Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

Having concluded that a private right of action exists under Title VI, the Court next turns to the questions of what must be proved to establish a violation of that statute and to what relief a successful Title VI claimant is entitled.

In *Guardians Association,* a majority of the Supreme Court expressed the view that a private plaintiff under Title VI could recover back pay at least as a remedy for intentional discrimination.

Title VI, which has been applicable to municipalities since its enactment in 1964, would therefore provide retroactive relief for intentional discrimination for the time periods prior to March 24, 1972, the date on which Title VII became applicable to municipalities.

For the reasons previously set forth at some length in this opinion, the Court believes plaintiffs have met their burden of proving intentional discrimination and therefore have established a violation of Title VI as well as Title VII.

The Court need not decide whether unintentional discrimination is actionable under Title VI. Also it is unnecessary to decide whether prospective equitable relief would be available solely under Title VI, since such relief is clearly available under Title VII which this Court has already concluded has been violated.[16]

---

**16.** In *Guardians Association* there is only a plurality opinion. The Court believes that it might prove helpful to summarize what in fact was held in that case. A majority of the Court in *Guardians* expressed the view that a private, plaintiff under Title VI could recover back pay at least as a remedy for intentional discrimination. A majority of the Court further seemed to agree that retroactive relief is available to private plaintiffs for all discrimination actionable under Title VI. Justice Marshall and Justice Stevens, as joined by Justices Brennan and Blackmun, argued that both prospective and retroactive relief were fully available to Title VI plaintiffs. 463 U.S. 582, 627, 637, 103 S.Ct. 3221, 3245, 3250. Justice O'Connor agreed that

## VI. *Conclusion*

This Court, in a pretrial order dated February 1, 1984, bifurcated this trial into two parts: a liability phase and a remedial phase. The first part of the trial concerning the liability of the defendants for unlawful employment discrimination is now complete. This opinion resolves the question of defendants' liability. Because of the difficult questions of law and the somewhat complicated nature of the facts in this case, this Court is certifying today's decision for immediate interlocutory appeal. Any party aggrieved by this decision is permitted to contest it in the United States Court of Appeals for the Sixth Circuit.

Whether or not such an appeal is filed, it is now incumbent upon the Court and the parties to proceed to the second phase of this lawsuit, the remedial phase.

While federal courts have broad equitable powers to fashion relief once a finding of employment discrimination is made, those courts must also be imbued with a sense of caution, which counsels reluctance in intervening in the day-to-day administration of a public agency or department.

Plaintiffs must and will receive vindication of their equal rights, as guaranteed by law. And yet, this Court is hesitant to embark upon a course which would result in it dictating to the defendants how to run the Division of Police. On the one hand, the Court is concerned with insuring the immediate end to discriminatory treatment of black officers in the Division. On the other hand, the Court does not wish to fashion a remedy which will impair the ability of the Division of Police to provide adequate police protection to the citizens of Columbus.

In an effort to accommodate these competing interests, the Court believes that the parties should first be afforded the opportunity to reach agreement concerning an appropriate remedy. Accordingly, the parties are directed to meet with the intention of fashioning a plan to remedy the unlawful discrimination found to exist in the Division of Police. The parties are to submit such a plan or a statement as to why no such plan could be formulated and agreed upon no later than February 15, 1985.

Thereafter, if no agreement can be reached, the Court will afford the parties an opportunity to present the Court with proposed plans, of their own devising, to remedy the violations of law found herein.

## VII. *Order*

To summarize this Court's legal conclusion:

Based upon the evidence adduced at trial including the testimony of expert and lay witnesses and the exhibits received in evidence, the Court finds that plaintiffs have met their burden of proving that the defendants discriminated against members of the plaintiff class in the areas of promotions and assignments and transfers and certain other terms and conditions of employment in violation of Title VI and Title VII of the Civil Rights Act. The Court further finds that plaintiffs have failed to carry their burden of proving discrimination with respect to the imposition of discipline and other terms and conditions of employment as specified elsewhere in this opinion.

The Clerk of Court is hereby directed to enter judgment in accordance with the Court's findings.

---

both prospective and retroactive equitable relief were available, but reserved judgment on the question of whether there is a private right of action. *Id.* at 584, n. 1, 103 S.Ct. at 3223, n. 1. Justice White, joined in part by Justice Rehnquist, put aside the question of the appropriate relief for intentional discrimination under Title VI while noting that generally in private actions under Title VI only relief in the form of future compliance is available. *Id.* at 607, 103 S.Ct. at 3235. Finally, the Chief Justice and Justice Powell did not reach the question of available remedies since they would have concluded that no private right of action is available under Title VI and further that plaintiff in that case failed to prove intentional discrimination.

Fortunately, this Court is relieved of the obligation of facing many of the unclear and open questions after the opinion in *Guardians* by virtue of the Court's conclusion that plaintiffs have proved that defendants intentionally discriminated against them in violation of Title VII as well as Title VI.

**440**

Pursuant to 28 U.S.C. § 1292(b), this Court certifies that with respect to the above liability findings there are controlling questions of law as to which there are substantial grounds for differences of opinion. The Court further certifies that an immediate appeal from this judgment may materially advance the ultimate resolution of this litigation.

It is hereby ORDERED that the defendants and their agents, servants, employees, and all other persons acting in concert or participation with them be, and they hereby are, permanently enjoined from discrimina-

ting on the basis of race in the operation of the Columbus Division of Police.

Plaintiffs and defendants are hereby directed to meet in an attempt to formulate a plan to remedy discrimination in the Columbus Division of Police. The parties are further directed to submit such a plan, or a statement as to why such a plan cannot be submitted, on or before February 15, 1985. Thereafter, the Court will resolve as promptly as possible the outstanding matters in this litigation.

So ORDERED.

APPENDIX

Map shows how the city is divided in police precincts
as of date of this opinion.

442

ORGANIZATIONAL STRUCTURE CHART
OF ALL BUREAUS WITHIN
THE COLUMBUS DIVISION OF POLICE

MAY 1978

ORGANIZATIONAL STRUCTURE CHART
OF ALL BUREAUS WITHIN
THE COLUMBUS DIVISION OF POLICE

AUGUST, 1983

* The Division has recently added an additional
shift, a "midwatch" which reports from 6:30 p.m. to 3:30 a.m.